JAMES S. HAM ET AL. v. BOARD OF LEVEE COMMISSIONERS FOR
YAZOO-MISSISSIPPI DELTA.

1. LEVEES.   *Power of commissioners.*   *Relocation of levee.*   *Laws* 1884,
   *p.* 142, *ch.* 168, *sec.* 4.

   The board of levee commissioners for Yazoo-Mississippi Delta, after having built a levee, may abandon it, or a part of it, and construct another in a different place.   The power to do so is granted by Laws 1884, p. 142, ch. 168, sec. 4, authorizing the board to build a levee along the river front, to abandon any portion of the old levee deemed unsafe, to build new levees on such ground as it may select and do all acts necessary to protect the district from overflow.

2. SAME.   *Discretion.*   *Courts will not control.*

   The courts will not, in the absence of fraud and bad faith, undertake to control the action of the levee board touching matters committed to its discretion and judgment on the ground alone that it acted hastily or unwisely.

3. SAME. *Use of bonds. Laws* 1902, *p.* 137, *ch.* 83.

> The board may use the proceeds of bonds, issued under Laws 1902, p. 137, ch. 83, for the building of a new levee in place of an old one at any time, the necessity for so doing having been demonstrated by high water.

4. SAME. *Power to obstruct drainage.*

> The levee board being empowered to construct levees, has the incidental power of obstructing drainage.

5. SAME. *Damages.*

> A land owener is entitled to recover from the levee board damages to his land resulting from the buliding of a levee so as to obstruct drainage, although the land be outside the levee.

6. CONSTITUTIONAL LAW. *Eminent domain. Constitution* 1890, *sec.* 17.

> Constitution 1890, § 17, making it a judicial question whether the contemplated use for which property is sought to be condemned by eminent domain proceedings be a public one, does not authorize the courts to determine the necessity for the taking.

FROM the chancery court of, second district, Coahoma county. HON. CAREY C. MOODY, Chancellor.

Ham, and others, appellants and cross-appellees, were complainants in the court below; the board of levee commissioners, appellee and cross-appellant, was defendant there. From a decree partly and largely in defendant's favor, the complainants appealed to the supreme court, and the defendant prosecuted a cross-appeal. The facts are fully stated in the opinion of the court.

*Fitzgerald & Maynard* and *D. A. Scott,* for appellants.

The fundamental law of our state, sec. 17 of the constitution of 1890, provides that private property shall not be taken or damages for public use without compensation first made, and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question and, as such, determined without regard to the legislative assertion that the use is public.

There is no contention that compensation has been given or offered to complainants, and no steps have been taken to condemn the land. Our courts have time and again held that an injunction would lie in such cases. We cite only a few authorities, as it is not necessary to cite more. *New Orleans, etc., R. Co.* v. *Frederic,* 46 Miss., 1; *Cameron* v. *Washington County,* 47 Miss., 264.

This is not a case of public emergency, which would justify the taking of private property for a public use without compensation being first made, upon the principle of imperative necessity for the public protection. As said by our supreme court in *Penrice* v. *Wallis,* 37 Miss., 172, "the necessity must be apparently present, and the apprehended danger must be so imminent and impending as not to admit of the delay incident to legal proceedings to condemn the property."

Under a proper exercise of the right of eminent domain, compensation must precede the taking, or be tendered before the taking, and the condemnation proceedings must conform strictly with the law, if this be not done, the corporation making entry is a trespasser. *Canton, etc., R. Co.* v. *French,* 68 Miss., 22. Two conditions are imposed as limitations on the right of eminent domain incident to every form of sovereignty: (1) The decision in some form, that private property is needed for the particular public use, and, (2) the assessment and payment or tender of compensation before it shall thus be appropriated. *Pearson* v. *Johnson,* 54 Miss., 263.

But there is a graver question than that of compensation involved in this suit. It is the question touching the power of the board under its charter to build the projected new line of levees at all. It is not a mere question of discretion in the board to determine when the necessity has arisen and whether or not it is a public use. The legislature gave the board certain powers and certain discretion within those powers to do particular things, but this discretion, even when the board acts within its powers, is not final, but is at last a judicial question.

Article 17, Constitution of Mississippi 1890; *Stearns* v. *City of Barre,* 87 Am. St. Rep., 721; *Chicago, etc., Ry. Co.* v. *Morehouse,* 88 Am. St. Rep., 930, 7 Am. & Eng. Enc. Pl. & Pr., 473, 535, and note 8.

The necessity must be proven when called in question. *Power* v. *Kitching,* 88 Am. St. Rep., 718, 18 A. Dig., 911 and 1556; *Lynch* v. *Forbes,* 42 Am. St. Rep., 406.

The affidavits for the complainants clearly show an attempted abuse of this discretion by the board, thereby invading and destroying the property of the complainants. A corporation never has the right to arbitrarily abuse the discretion confided to it by the law, or by its charter, and the chancery court will control it and correct such abuse. *New Orleans, etc., R. Co.* v. *Frederic,* 46 Miss., 1; *State* v. *Board of Directors,* 56 Am. St. Rep., 503. Under the charter of the defendant it is required to protect all property in this district from loss and destruction. Then the primary object of the law was to protect all property in the district, including that of the complainants, if possible. No question of the expense, of economy, can be given as a reason for throwing their property outside of this protection.

We come now to the discussion of the question of the powers granted by the legislature under the defendant's charter. Section 4 names these powers, to wit: (1) To build, rebuild, strengthen, elevate and maintain the levee along the Mississippi river; (2) to determine the base, height, slope and width of the levee; (3) they may abandon any portion of the old levee that they may regard as improperly built or unsafe; (4) they may repair the old levee or build a new levee on such grounds as they select, provided the board, in exercising the power and authority conferred on them by the provisions of this act may, in their discretion, adopt, strengthen, repair, elevate and rebuild the present line of levee as it now exists whenever and whereever it is practicable for them to do so.

All this they have long since done. They, in their discre-

tion, located their lines of levee, adopting in many instances the old levee, and in some abandoning and building new levees.

These lines of levee were built many years ago by the defendant, and are in fine condition, well sodded with Bermuda grass and built much higher and stronger than any other levees.

In no part of this charter can there be found any express grant of any powers to reselect or relocate these lines of levee after the most advantageous route has been once adopted.

The same principles governing railroad companies as to their rights and powers to relocate and abandon established lines applies to the relocation of levee and an abandonment of its established lines. Complainants have purchased their lands and improved the same with reference to the permanency of these lines of levees, and they have acquired property rights in the same. The only implied power the defendant can have is the right to enlarge the present levees, or to abandon and relocate the same when imperatively required. No consideration of a better, shorter, or more convenient route, or of economy in the expenditure of its money and of a more advantageous location in a new line is sufficient to authorize such change in location. There must be some imperious necessity for the relocation. These principles were so declared in almost the exact language we have used in this brief in *Lusby* v. *R. R. Co.,* 73 Miss., 368, where it was held that the railroad company had exhausted its powers under the charter to relocate.

The discretion of the board, even in cases where unquestioned power is given to build levees at will, is not final nor so sacred as to be revised by a court of chancery. It was to curb this discretion so lavishly given to corporations by our legislature that caused those distinguished men who framed our fundamental laws to insert sec. 17 of our constitution.

*J. T. Lowe,* for appellee.

Injunctions will not lie to control or direct official judgments or discretion. *Koehler* v. *Barren* (C. C.), 25 Fed. Rep., 161.

"Where the public authorities are not acting *mala fides* the exercise of their discretion will not be reviewed in a court of equity on the allegation of a telegraph company that they are attempting to compel it to place its wires in insufficient and defective subways." *Western Union Tel. Co.* v. *City of New York* (C. C.), 38 Fed., 552, and 3 L. R. A., 449.

"When no excess of authority or actual corruption is shown, injunction will not be granted to restrain the commissioners of excise from granting licenses in the exercise of the discretion given to them by statute." *Leigh* v. *Westervelt,* 9 N. Y. Sup. Ct., 618.

"Injunction will not be granted to restrain or supervise the exercise of the discretion conferred by law upon officers in a discharge of their duties." *Burwell* v. *Vance,* 93 N. C., 73.

"The performance of a public duty, such, for instance, as the construction of a county fence, will not be enjoined, unless it clearly appears to be without legal warrant." *Busbee* v. *Weight County Commissioners,* 83 N. C., 143.

"Equity will not interfere by injunction with the different boards of municipality in reference to the price to be charged for gas, unless there has been a discrimination, and that discrimination compels the party to pay more than others similarly situated." *Bellaire Goulet Co.* v. *Findlay,* 5 Ohio Cir. Ct., 418.

"If municipal officers transcend their powers or neglect their duty, they are amenable to control by the court; but to warrant enjoining the exercise of power and discretion specially delegated by the legislature, the case should be clear from doubt." *Ford* v. *Borough of West Pittson,* 6 Luz. Reg., 54.

"To warrant interference by injunction with the exercise of process and discretion conferred by the legislature, the case should be clear beyond doubt." *Rittenhouse* v. *Creasy,* 12 Luz. Leg. Reg., 14.

"Equity will decline to interfere with a public officer in the

execution of his duty when there is simply a disputed question of fact, and the plaintiff, if injured, has his remedy at law against those whom he claims are transcending their authority." *Hay* v. *Easterbrook,* 15 Wkly. Notes Cas., 222.

"Where the city of Philadelphia, by ordinance, appointed certain trustees to take charge of and have complete management of the gas works of the city, equity would not interfere by injunction to control such trustees in the exercise of their discretion in the method or process adopted by them in the administration of their trust, in the absence of fraud or *mala fides.*" *Chandler* v. *Gardner,* 2 Pa. Co. St. R., 407.

"Where the exercise of certain powers had been granted by the law to municipal authorities and the method of their exercise rests in the discretion of such authorities, equity will not interfere by injunction to control such discretion." *Biltz* v. *Borough,* 3 Pa. Co. Ct. R., 412.

"Equity will not enjoin public officers at the suit of a private person until they have actually done some act in violation of the latter's legal rights, or are threatening him with irreparable injury." *Judd* v. *Town of Fox Lake,* 28 Wis., 583.

## STATE OR NATIONAL BOARDS AND OFFICERS.

"The courts have no jurisdiction to enjoin execution of an order of the postmaster general, made pursuant to Rev. St., secs. 3839, 4041." *Enterprise Saving Association* v. *Zoonstein,* 15 C. C. A., 153, 67 Fed., 1000.

"A federal court will not compel by injunction the officers of a state to execute the laws thereof. To do so would be an attempt by the court to administer the state government." *McCauley* v. *Kellog,* Fed. Cases, No. 8688.

"Since the legislature has power to change the county boundaries an injunction will not lie to restrain action by the commissioners to fix boundaries between the counties," etc. *Commissioners of Chattam County* v. *Thorne,* 117 N. C., 211.

COUNTY OR TOWN BOARDS AND OFFICERS.

"When a county board have acted in good faith in ordering a county seat election, etc., they cannot be enjoined from publishing the results," etc.   *People* v. *Board of Supervisors,* 116 Fed., 776.   Held that injunction does not lie to restrain action by commissioners in the exercise of official function in holding election and canvassing returns."   *Mendenhall* v. *Benham,* 35 Fla., 250.

"The provision of the constitution providing that private property shall not be taken or damaged for public purposes without compensation, does not entitle the property owner to an injunction to restrain the building of a jail near his land on the ground that he will be damaged," etc.   *Bacon* v. *Walker,* 77 Ga., 336.

"In the absence of any showing of fraud or corruption, a court of equity will not interfere with the action of a county board in settling claims against the county connected with the construction of a court house."   *Harms* v. *Fitzgerald,* 1 Ill. App., 325.

"A board of county commissioners cannot be prevented by injunction from changing the depository of public money of the county, when in the discretion of the board it is deemed best that a change should be made."   *First National Bank* v. *Stranathan,* 43 Kan., 648.

"It is not within the sound discretion of a court of equity to interfere to stop the proceedings of a class of officers in the county charged with the registration of its voters, because a few of the officers in certain districts were not proper subjects of appointment."   *Davis* v. *Winslow,* 81 Am. Dec., 584.

"Equity will not enjoin a change in the location of a bridge across a navigable river on information of the attorney general."   *Allen* v. *Freeholders,* 13 N. J. Eq., 68.

"Injunction will not lie to restrain action of town commissioners, creating commissioners of surveys and street commis-

sioners, and empowering them to vacate old streets, create and improve now ones." 22 N. J. Eq., 458.

### MUNICIPALITIES AND MUNICIPAL OFFICERS IN GENERAL.

"Where the action of a city in executing a public work is within the scope of its authority, and free from fraud and corruption, it will not be enjoined, though the methods adopted result in special damage to complainant." *Union Steamboat Co.* v. *Chicago* (C. C.), 39 Fed., 723.

"An injunction will not lie against municipal authorities who are proceeding under their charter to try the question whether a certain mill pond is a nuisance." · *Americus* v. *Mitchell*, 74 Ga., 377.

"The people cannot maintain an action to enjoin a transaction of a municipal corporation which is within the scope of its powers on the ground that the transaction is in violation of statutes or ordinances, or in fraud of the rights of the corporation, if the trust imposed upon the corporation are not such that the violation of same will effect the interest of the whole state." *People* v. *City of New York*, 27 How. Prac., 34.

"When a municipal corporation acting in conformity of the powers vested in it by a constitutional law commits, in the exercise of its discretion thereunder, an honest mistake which does not amount to a wanton disregard of public interest or a violation of public rights, the court has no power to interfere with the exercise of such discretion." *Schall* v. *Norristown*, 6 Leg. Gaz., 157.

### SCHOOL BOARDS AND OFFICERS.

"An injunction will not be granted to interfere with the discretion of the county board of school commissioners as to the exercise of their functions." *Wylie* v. *Alleghany School Commissioners*, 51 Md., 401.

"An injunction will not be granted to control the discretion of a board of school commissioners in the letter of a contract

for supplying one of the public schools with a heating apparatus." *City of Baltimore* v. *Weatherby,* 52 Md., 442.

"As a large discretion is given to school directors in the performance of their duties, equity will not interfere by injunction to control their discretion in the erection of school buildings, except in a clear case of abuse of power and injury to the district." *Hughes* v. *School Directors,* Huz. Leg. Reg., 284.

"Though school directors have selected a location for a school house which is not the best place that could have been chosen, the court will not by injunction restrain them from carrying out a contract for the erection of the building in that location, unless such directors have acted fraudulently or arbitrarily." *Cooney* v. *Gardner,* 16 Penn. Ct. of Claims, 547.

## HIGHWAY BOARDS AND OFFICERS.

"A court of equity will not restrain a trustee of a town engaged in laying out a highway for making an excavation for a certain distance on adjoining land." *Fleemingberg* v. *Wilson,* 65 Ky., 203.

"A court of chancery will not enjoin highway commissioners from condemning land for a highway, except where the injury will be irreparable." *Brown* v. *Gardner,* 1 Har., 291.

## CANAL AND DRAINAGE OFFICERS.

"Where drain commissioners are given a discretion as to the method to pursue in draining land, and they are in good faith pursuing the course which they believe to be the best and cheapest, they will not be restrained by injunction." *Phillips* v. *Wickham,* 1 Paige, 590.

"Where commissioners are appointed under an act of the legislature to drain swamp lands are acting in good faith and are not violating the plain and manifest intent of the statute, a court will not be justified in restraining their proceedings by injunction." *Hartwell* v. *Armstrong,* 19 Barb., 166.

"Where canal commissioners are vested with the discretion-

ary powers as to the amount of water to be taken from a river to supply a canal, courts will not, at the suit of a lower owner, interfere by injunction in the exercise of such discretion." *Cooper* v. *Williams*, 22 Am. Dec., 745.

"Equity will not, on the application of one who may be affected by the construction of a proposed ditch, enjoin the commissioners from permitting the tiling of a ditch or make any order interfering with the powers delegated to them, but will leave the person aggrieved to his remedy at law." *Vonholt* v. *Gordon*, 30 Wkly. Law Bul., 33.

And to the same effect we find *Lews* v. *Denver City Water Works Co.*, 41 Am. St. Rep., 248; *Stephen* v. *St. Mary Training School*, 36 Am. St. Rep., 438, cases cited and noted; *Harrison* v. *City of New Orleans*, 39 Am. Rep., 272.

And we contend that if the chancery court can interfere with the appellees in the exercise of their discretion in the building, maintaining and repairing the levees, that then on the other hand, the chancery court could grant authority under a proceeding to build, repair and maintain said levees, and therefore such a thing as a levee board, consisting of commissioners, etc., is altogether useless, because all of the functions devolving on said board could be administered by a court of chancery.

We now call the court's attention to the act of the legislature, 1902, p. 137, granting the appellees authority to issue $250,-000 of bonds to meet high water emergencies and dangers from caving banks, etc., and we insist that the position taken by appellants is entirely too narrow. The title of the act, so appellants contend, puts a restriction and limitation on the authority granted to the appellees, to the extent that they cannot issue said bonds except for the purpose of raising funds for high water emergencies; be that as it may, but what is high-water emergencies? Has there even been one single yard of dirt placed on appellee's levees from the early fifties down to the present day that was not put there to meet high water emergen-

cies? What reason or sense could there be in contending that it was put there for any other purpose? There can be no reason for building levees except to meet the emergencies that may be brought about when the waters are at flood tide. There is no necessity to build levees against low waters. But we do insist that there is, in levee construction, an ever present necessity for the "preparing for war in time of peace," and it would be absolutely impossible to build levees or to do any work whatever, in the way of repairing same, when the waters are up. We contend that the act authorized the issuance of the bonds to meet the expenses of a temporary high water and that any other construction of the terms used, makes the whole act itself simply ridiculous.

Argued orally by *J. W. Cutrer* and *J. T. Lowe,* for appellee.

TRULY, J., delivered the opinion of the court.

The Yazoo-Mississippi Delta levee district comprises all of the northern counties of the state which are subject to overflow from the Mississippi river. At the date of the filing of this bill appellee levee board maintained three distinct lines of levees: One beginning at the foothills near the northern boundary of the state, and extending southward along or near the bank of the Mississippi river; terminating near the bank of the river, about ninety and one-half miles from the upper terminus, about one mile below Rescue Landing, in Coahoma county, and near the edge of the basin known as "Lewis swamp." This is called the "front line." Another line of levee beginning at the south boundary of the district, extending northward, passing about five miles to the eastward of the lower terminus of said front line, and overlapping the same by continuing northeast to a point about twelve miles above said front line terminus. This is called the "back line," or "Hushpuckena system." Between these two lines there lies an extensive basin, known as "Lewis swamp," through which drains the

Hushpuckena basin. The third line of levee connects the two former lines, and extends from a point about four miles above the lower terminus of the front line to a point about seven miles below the upper terminus of the back line. This levee traverses a portion of the Hushpuckena channel called "Ward Lake," and hence the levee is called the "Ward Lake line"; being a little over five miles long. For a portion of this distance it traverses Ward Lake, a body of water varying in depth from twelve to twenty feet; and in the channel of the lake there is placed an iron culvert, which is used for drainage purposes from one side of the levee to the other. On June 10, 1903, appellee levee board passed the following order: "It is ordered that a new levee shall be constructed to extend from section 81 on the front line to connect with the back line, or Hushpuckena system, on section 8, of that line on the McMahon ridge; that this shall be a permanent part of this levee system in place of that portion of the main front levee that extends from the point of divergence on section 81, to the end of the line below Rescue landing, and of the Ward Lake line." The effect of this order was to abandon as a part of the permanent levee system of that district that portion of the front line south of section 81, and all of the Ward Lake line. The result of this abandonment and the construction of the new or projected line is the cause of this suit. Appellants, on the 11th day of September, 1903, filed the original bill of complaint herein in the chancery court of Coahoma county, in which they averred that they were landowners in that portion of said Coahoma county included in the levee district which would be left unprotected from the ravages of the Mississippi river floods if the front line and the Ward Lake line were abandoned, as designed by the order above recited. They averred that the levees proposed to be abandoned were in good condition, and by a small expenditure could be made sufficiently strong to protect the lands of the district, and that the proposed new line was not necessary, and to construct the same would be a wasting of the funds of the taxpayers; that the territory affected by the

proposed abandonment of the levee consisted of 6,000 acres of valuable land belonging to the complainants. And they charged: First, that the effect of said act of constructing said projected levee would be to collect the rain water and seepage water on their lands, rendering them marshy and unfit for cultivation or for any other use; inflicting permanent damage and irreparable injury, which was irremediable at law. Second, that there was no emergency calling for the building of this new levee. It was not a public necessity, and was in no sense a "high water emergency." Third, that there was no law authorizing the levee board to build the said projected levee, and the building of the same would be a gross abuse of the board's discretionary power, and a lavish and unnecessary expenditure of the people's money; that the construction thereof would cost about $400,-000; and that the levee, when built, would run through and over treacherous soil, and could never be made as secure as the line proposed to be abandoned. Fourth, that the board of levee commissioners intended to use in the construction of said levee money which it expected to obtain from the sale of bonds which it was authorized to issue under Acts 1902, p. 137, ch. 83, entitled "An act to authorize the board of levee commissioners for the Yazoo-Mississippi Delta to issue bonds to the amount not exceeding $250,000, for the purpose of raising funds for high water emergencies, and for other purposes;" that the intent of the said act was that the proceeds of the bonds were to be used during periods of high water to meet any emergency that might arise, to protect said district from danger from high water, or repair damages to the levee caused by or threatened from crevasses, caving banks, and other unexpected casualties; and that the board was without authority to use said funds for any purpose during low water periods. On the filing of the bill an injunction was granted by the chancellor, restraining the levee board. On the 16th of September, 1903, appellee levee board filed its answer to the bill, in which it admitted the ownership of the lands described by complainants, denied that com-

plainants would be damaged from rain or seepage water, but averred that, on the contrary, the construction of the projected line of levee would prevent a large part of the surface water which now drains into Ward Lake from reaching the lands described; denied that they were without remedy at law for any damage which might be inflicted upon them by the construction of the proposed levee; admitted that it was the intention of the board to build the new levee as set out in the bill of complaint; admitted the passage of the order referred to but denied that the said levee was unnecessary, or that to build the same would be a useless expenditure of the funds of the levee board; averred that the front levee, which it was proposed to abandon, was dangerous and impossible to maintain, and that the Ward Lake line was only intended as a local temporary protection; that it was not, and could not be, built up and maintained to the standard, for various reasons—principally because of the fact that for some portion of its length it ran through the waters of Ward Lake, thus necessitating the maintenance of the culvert in the channel in the lake, and that this culvert was a constant menace to the levee, and weakened the protection of the lands of the district; admitted that it is the intention of the board to use a portion of the proceeds of the bonds mentioned for the purpose of constructing the projected levee, but denied that any portion of such proceeds would be used for the purchase of rights of way; and averred that it had a right to use such funds, as the district was then confronted with such an emergency as was contemplated by said act. Upon the filing of answer the board duly notified complainants of a motion then entered to dissolve the injunction. Subsequently the chancellor heard the motion, both sides introducing affidavits.

There is no material conflict of fact between the two sides to this litigation, so far as relates to existing conditions in reference to the location of the levees and the lands involved. The testimony shows that a part of the front line, from sec. 81 to its

lower terminus, and the Ward Lake line, have been condemned by the United States Mississippi River commission as being unsafe, and not constructed so as to be able to give protection to the lands behind them. One point of dispute is as to whether or not these lines are now threatened by caving banks, or whether or not the maintenance of the culvert in Ward Lake is a menace to the safety of that line. In this connection a reference to the report of the chief engineer of the district shows that immediately after the flood of 1897 he advised and strongly urged the levee commissioners to build a cross levee to run near where the now projected levee has been located. His report of June 7, 1897, is as fillows: "Another important detail to which I wish to invite the board's attention is the question of abandoning the front line between section 75, together with the Ward Lake line, and converting the Hushpuckena system into the main front line throughout its entire length, instead of, as heretofore, maintaining a front line, with a backwater levee behind it. In comparing the two schemes together, it is found that the front system, proposed to be thrown out with the Ward Lake line, exceeds the back line between the common points of junction by thirteen miles; and a comparative estimate of the yardage required to bring up each to the higher grades now found to be necessary shows a balance in favor of the back line of over one million cubic yards. Another consideration is that the Ward Lake line, for a considerable part of its length, is on such treacherous ground as to make it a matter of perplexity to determine how it should be treated in order to make it secure in the future. The problem of making our levee lines secure in that part of the system will be greatly simplified by the change suggested." The board, however, at that time declined to adopt the recommendations of the chief engineer, and expended moneys in the strengthening of the line proposed then to be abandoned. After the high water of 1903, the chief engineer, making his report on June 9, 1903 after a full relation of all the facts of the flood, which had just recently subsided,

and of the various conditions of danger then threatened the levee system of the district, concluded his report with these words: "In view of the foregoing facts, the conclusion is inevitable that the maintenance of the front line extension as a permanent feature of our levee system must be abandoned." And he again urged the adoption of the cross line of levee, which suggestion upon the next day was approved and adopted by the board, as shown by its order in that regard. The effect of the new or projected line of levee, as shown by the undisputed evidence in this record, is to save the district the maintenance of eight miles of levee, all of which, according to the testimony of the chief engineer, is endangered by various causes —caving banks, boils, landslides, sandy and unsound foundation, and the culvert in Ward Lake. There was sharp conflict in the testimony as to the advisability and practicability of maintaining the Ward Lake line and the front line south of section 81; the complainants contending that this portion could be made safe and substantial at small cost, that no part was in danger from boils or caving banks, and that its safety was not threatened by the culvert in Ward Lake. The chief engineer, on behalf of appellee, made affidavit that, in his judgment, the safety of a large part of the district was dependent upon the erection of the new line, and consequent abandonment of the part mentioned; that, owing to the washing away of the lower portion of the front levee, it would be necessary to build the Ward Lake levee higher, and this would entail considerable expense. There was difference of poinion as to the extent of the damage which would be inflicted on complainants, but it is practically conceded that the lands will be damaged, the drainage interfered with, and they will be left unprotected from the floods of the Mississippi river.

On the hearing of the motion, the chancellor rendered a decree partially dissolving the injunction, but which contained this provision: "The defendants are allowed to go forward with their work of construction and building of the levees in

controversy in the cause as though no appeal had been taken, after they shall have first legally acquired the right so to do, but with this express understanding: that they, the said defendants are not in anywise to obstruct the drainage to the lands of the complainants." From this decree complainants appealed, and the levee board prosecuted a cross appeal.

The record here presents for consideration and decision the following questions: First, has the levee board the power to abandon one levee and construct another, located in a different place? If so, is its judgment and discretion in locating the new levee subject to review by the courts? Second, if vested with full power in building and locating new levees, has the levee board, under the facts of the instant case, the authority to use the proceeds of bonds by virtue of chapter 83, p. 137, Laws 1902? Third, If the new levee can lawfully be built, what rights have complainants, and how may they be asserted?

The determination of the first inquiry requires a consideration of chapter 168, p .140, Laws 1884, in which the powers, duties, and privileges of the board of levee commissioners of the Yazoo-Mississippi Delta are stated. Section 4 of that act provides as follows: "That said board of levee commissioners of the Yazoo-Mississippi Delta shall have power, and it is hereby made their duty to build, rebuild, strengthen, elevate and maintain the levee upon and along the Mississippi river front, in and through the counties of DeSoto, Tunica, and Coahoma to the line of the levee now owned and maintained by the Mississippi levee district. They shall have power to determine the base, height, slope and width of the levee; and they may abandon any portion of the old levee that they may regard as improperly built or unsafe, and may repair the old levees and build new levees on such ground as they may select, and may make all contracts for the work and all needful regulations and do all acts necessary to protect their said district from overflow by the waters of the Mississippi river. And they shall

also have power and authority to join said levee to or with any levee, either private or public, within said Yazoo-Mississippi Delta district, to the end of making and preserving a continuous and unbroken line of levee along said Mississippi river front; provided, that said commissioners in exercising the power and authority conferred upon them by the provisions of this act may, in their discretion, adopt, strengthen, repair, elevate and rebuild the present line of levee as it now exists in the said counties of De Soto, Tunica and Coahoma wherever or whenever it is practicable for them to do so; and in the location of any new levee, or the elevation, repairing or rebuilding of any old levee, said commissioners may, in their discretion, wherever practicable, adopt and conform to the plans, specifications and views of the Mississippi river commission, and co-operate with said Mississippi river commission; provided, that the board of levee commissioners shall not in any case pay for any levee or part of levee, either private or public, now built or erected." The constitution of 1890 recognized and continued the existence of the board of levee commissioners of the Yazoo-Mississippi Delta, and approved the division of the state into levee districts. By section 232 it was provided that the "commissioners of said levee district shall have supervision of the erection, repair and maintenance of the levees in their respective districts"; and by secton 233, they are granted "authority and full power to appropriate private property for the purpose of constructing, maintaining and repairing levees," and it provides a method for the assessment of damages to land, or when any owner objects to the "location" of a levee on his land.

The first contention of appellants is that the levee board having once adopted and established a line of levee, the power granted by the law has been exhausted and the levee board is now without power to relocate the levee, or to abandon any portion of the established line. In view of the generality and broadness of the terms employed in granting powers to the ap-

pellee board, it is plain that it was the intention to vest the boards of levee commissioners with plenary authority to deal with the "erection, maintenance and repair" of the levee system at their discretion, for the purpose of protecting the property of their respective districts from loss and destruction. The act incorporating the board of levee commissioners of the Yazoo-Mississippi Delta expressly directs that it shall be construed as "an exercise by the legislature of all the powers appertaining to it necessary to carry into effect the intent of said act," and, as stated, this legislative enactment is practically embodied in our organic law. The terms employed in the constitution, by every reasonable interpretation, convey the evident design of clothing levee boards with the power to "erect," "construct," and "locate" levees—manifestly referring to levees to be built in the future, as contingencies might arise or the judgment of the levee commissioners dictate, and clearly not meaning levees already constructed and located. To hold that a board of levee commissioners could not at any time, in the exercise of a sound discretion, abandon an old and locate a new line of levee, might, and probably would, result disastrously. Assume in the case at bar that the testimony of the chief engineer be true, and his judgment sound—and he seems, from this record, to have labored most faithfully, intelligently, and successfully in his efforts to protect the property and people of his district from the ravages of the threatened flood; how disastrous would be the result if the board was prevented from building a new levee, and the old one should cave into the river, or be broken by a crevasse, as the chief engineer fears and predicts! The very nature of the ever shifting yet ever present danger of ruin by flood, against which the levees are designed to guard, renders it imperative that the board should have the fullest latitude in dealing with each situation as it may arise and confront them. It was certainly never the design of the legislature to place such a limitation upon the power of the levee boards as would prevent them relocating any line of levee, when, by timely

action, they could prevent an overflow, which would be inevitable if the levee was left unchanged. If by the force of the flood the levees were broken, washed away, or caved into the river the power of the levee boards to construct a new line, in necessarily a different location, is unquestioned and unquestionable. Surely it cannot be seriously contended that the undoubted power to protect against a repetition of the flood does not necessarily include the power to guard against and prevent its occurring. We have no doubt it was the legislative design to grant levee boards, at their discretion, full power to change their line of levee as would best conserve the interests of the districts. There is no analogy between the cases of a line of levee intended to protect a people from ruin, and a line of railroad designed to serve the public as passengers or shippers of freight. The one is for the protection, the other for the convenience, of the public. It is true that railroads, having once established and constructed their lines, cannot abandon or relocate them from any motives of expediency or convenience, or because a proposed new route would be more advantageous to the corporation, but the controlling legal principle there has no application here. In the instant case, according to the testimony of the cheif engineer of the levee board, the change of the location is not dictated by any motive of expedincy, economy, or convenience, but from an existing necessity, which requires the change to be made in order to accomplish the specific end for which the levee board was created; *i. e.*, the protection of the property of the district from overflow by the construction and maintenance of an effectve line of levees. In such cases the right to relocate is incident to the grant of the power of exercising the right of eminent domain; otherwise sudden disaster or insurmountable natural obstacles might defeat the very purpose for which the corporation was created.

Again, it is said that whether the proposed taking of the land of complainants for levee purposes is for the public use is by section 17 of the constitution made a judicial question, and to

be determined by the courts without regard to legislative assertion, and that the courts should review the exercise of discretion by the board of levee commissioners in the abandonment of the old levee and the establishment of the new line. The facts of this record demonstrate to our mind that the taking of the private property in this instance is for the "public use," under any reasonable interpretation of that term. Many lives and much property—numerous valuable and fertile plantations—depend for safety and preservation upon the strength of the levees. A crevasse at any point along the entire front line would entail incalculable loss and great suffering. The accepted theory upon which the building of the levees is justified in any instance is that they are for the general public good—a doctrine too firmly established to be now lightly disturbed.

The building of the new levee being within the power of the board of levee commissioners, and the taking of the private property being judicially determined to be for a public use, the courts will not place judicial restraint upon the manner in which the board, in the exercise of its discretion, uses the power providentially delegated to it by the state. It is for the courts to determine that the proposed taking is for a public use, but, this being so decided, it is for the commissioners to decide upon the necessity of such taking. In re Fowler, 53 N. Y., 60; *Call v. Town of Wilkesboro*, 115 N. C., 337, 20 S. E., 468; *C., R. I. & P. R. Co. v. Town of Lake*, 71 Ill., 333; *Waterworks Co. v. Burkhart*, 41 Ind., 364; *Smedley v. Erwin*, 51 Pa., 445; *Mining Co. v. City of Joplin* (Mo.), 27 S. W., 406; *Barrett v. Kemp*, 91 Iowa, 296, 59 N. W., 76. Courts will interfere and review the exercise of the discretion of those to whom the power of eminent domain has been delegated by the legislative enactment only in exceptional cases—as when property is appropriated for private purposes under the guise of public use, or if the condemnation is sought for private gain, or from willful or malicious purposes, or to injure or destroy the rights of other parties, or that they acted without warrant of law

and oppressively. *Hurley v. Levee Com'rs,* 76 Miss., 141, 23 South., 580; Mills, Eminent Domain, sec. 11; *Douglass v. Byrnes* (C. C.), 59 Fed., 29; *Lynch v. Forbes* (Mass.), 37 N. E., 437, 42 Am. St. Rep., 404. Confessedly, the case at bar does not fall within the exceptions stated. The good faith of the board of levee commissioners in locating the proposed levee and taking the land of complainants is not impugned, and the courts will not attempt to dictate or control their actions on the ground alone that they may have acted hastily or unwisely.

The second inquiry presented by this record is as to the authority of the board of levee commissioners for the Yazoo-Mississippi Delta to expend the proceeds of certain bonds which it is authorized to issue by virtue of the provisions of ch. 83, p. 137, Laws 1902. Said act is entitled, "An act to authorize the board of levee commissioners for the Yazoo-Mississippi Delta to issue bonds to an amount not exceeding $250,000, for the purpose of raising funds for high water emergencies, and for other purposes;" and section 3 thereof is in the following words: *"Bonds to be sold for repair of levees.* Sec. 3. The said board is authorized to sell the bonds, or any part thereof, whenever, by suitable resolution and order of the board, they determine that any part of the levees of said board is endangered by caving banks or high water, and said board shall have power thereafter to make sale of the whole or any part of the bonds hereby authorized to be issued, but the said bonds shall not be sold for less than their face value, and when sold the proceeds thereof shall be used and expended by the said board for the purpose of protecting the territory embraced within the Yazoo-Mississippi Delta levee district from overflow, and to meet any and all emergencies that may arise, to protect the said district from danger during periods of high water on the Mississippi River, or to repair damages to the levees of said district caused by or threatened from crevasses, caving banks, or other unexpected casualties." In pursuance of the requirement of said sec-

tion the board, by "suitable resolution and order," determined that certain parts of the levees of said district were "endangered by caving banks" and the "present stage of high water." We quote from said order, unanimously adopted on June 29, 1903: "Whereas, the Mississippi river is again at flood height, and has for many days last past maintained a flood plane above the known danger line of the waters of said river; and this board is now not able to determine what further and additional damage has been and will hereafter be inflicted upon the said levees of this board by the said present stage of high water and by caving banks; and, whereas, there has already arisen an existing emergency confronting this levee board which, in the opinion of this board, requires that they shall issue and sell two hundred and fifty thousand dollars of the bonds of this board, to secure funds to protect this levee district from danger caused by the giving away of a part of its line of levees and from caving banks and the high water." It is admitted that the board of levee commissioners intend to use a portion of the proceeds of said emergency bonds in the construction of the new line. The contentions of appellants on this point are that the title of the bill does not, as required by section 71 of the constitution, "indicate clearly" that the use to which the money is sought to be put was the subject-matter of the legislation proposed by said act; that the levee board cannot devote the proceeds to any purpose other than what is clearly indicated in the title, *i. e.,* "for high-water emergencies;" and, further, that such emergencies as were contemplated by said act could only arise when the district was in actual danger of a then impending overflow. We cannot concur in this view. The determination of what shall constitute a high-water emergency is by the express terms of the act left to the sole decision of the board of levee commissioners, and it has, by resolution decided that a high-water emergency does exist, and that the levees of the district are endangered by high water and caving banks—the very contingency contemplated by the act. If the situation was as set out in the resolution of the board, then a

high-water emergency had arisen, and the title of the act clearly indicates that the use of the funds under such circumstances was within the scope of the proposed legislation. We see no force in the argument which would require the board to wait until there was imminent and impending danger to the property which they are charged with the duty of protecting being overwhelmed by flood before the evidently necessary steps of prevention could legally be taken. The manifest purpose of the act in question was to place at the disposal of the board of levee commissioners an emergency fund, which was to be expended, at the discretion of the board, whenever the levees of the district were threatened by a high-water emergency, whether such emergency was on account of high water then existing, or from crevasses, caving banks, or other unexpected casualty. In view of the necessarily large powers of discretion with which the board is clothed by law, in order that it may successfully carry into effect the objects of its creation, we think the proposed use of the funds arising from the sale of the emergency bonds does not contravene the language or intent of the act under consideration.

The sole remaining question requiring consideration is what rights and remedies the complainants have, and how they can be asserted. There is no contention but that they are entitled to due compensation for the value of all property taken and for all damages caused by the erection of the proposed levee, and there is no denial that this must be made before the property is in fact taken. As to this, appellants have a perfectly plain and adequate remedy prescribed by law, and the methods in which their rights may be asserted is clearly set out in section 233 of the constitution, and section 3 of chapter 168, p. 142, Laws 1884. Nor is the extent of their rights subject to doubt. It is true that they cannot recover damages from the fact alone that their lands are left outside the levee, and are therefore not protected from the high water. Recovery on this ground is expressly forbidden by section 238 of the constitution. This branch of the subject was most elaborately discussed in *Richardson* v. *Board of Mis-*

*sissippi Levee Commissioners,* 77 Miss., 518, 26 South., 963, and it was there expressly decided that the damages mentioned in section 17 of the constitution, for which due compensation was to be made, embraced "all damages, direct or consequential, immediate or remote." See *Vicksburg* v. *Herman,* 72 Miss., 211, 16 South., 434; *Duncan* v. *Levee Commissioners,* 74 Miss., 125, 20 South., 838. So that appellants have ample protection in existing provisions not only to prevent the board of levee commissioners from taking any of their property for public use without first fully paying therefor, but to also insure that they will receive due compensation for all damages inflicted, whether such damages are caused by seepage water, damming of surface water, or obstructing of natural drainage, and whether the land affected lies outside or inside of the levee.

We are of the opinion that the decree of the chancellor dissolving the injunction herein, and permitting the board of levee commissioners to proceed with the construction of the proposed new line of levee, was eminently correct. The safety of the entire district might be jeopardized by a delay in the prosecution of the projected work. But as levees are constructed for the sole purpose of protecting lands from overflow, and, in order to prove effective, must necessarily prevent the ingress of water, it follows that they must inevitably interfere with and obstruct the drainage of the lands immediately adjacent; and this has been, in express terms, recognized as an element of damage for which due compensation must be made.

From this record it appears that the proper construction of a levee necessarily entails the closing of all natural drainage which flows through or under the levee, and that the United States Mississippi River Commission, has officially condemned, and refused to assist in the maintenance of, any levee through which, by any device, the flow of water is permitted. It follows, therefore, that the clause in the decree permitting the board of levee commissioners to proceed with the construction of the levee only on condition that it did not "in any wise obstruct the drainage of

the lands of complainants" was error. The power to construct the levee includes the incidental necessity of obstructing the drainage.

The decree of the chancellor on direct appeal is affirmed, and on cross appeal is reversed, and the bill is hereby dismissed, and appellants taxed with all costs in both courts.

*Reversed on cross-appeal.*