Toler *et al. v.* Bear Creek Drainage Dist.*

(In Banc. Nov. 16, 1925.)

[106 So. 88. No. 24948.]

1. Drains. *Equality of benefits to all lands not essential to formation of district.*

Equality of benefits to all the lands therein is not essential to formation of drainage district, under Laws 1914, chapter 269, section 2 (Hemingway's Code, section 4438).

2. Drains. *Authority to enact laws for establishing districts derived from police power.*

Authority to enact laws for establishment of drainage districts is derived from the police power.

3. Drains. *Purpose of establishment of districts promotion of public welfare.*

Purpose for which drainage districts may be and are established is to promote public welfare.

4. Drains. *No right of individuals as against district to protect land by levee within district.*

Private drainage rights of owners of land within a drainage district become merged in and are supplanted by rights relative thereto conferred by the statute on the district, so that any prior rights

of individuals to protect their lands by levee within the district yield to the rights of district relative thereto.

5. WATERS AND WATERCOURSES. *Method of fending off water from land limited.*

Right at common law of landowner to fend off surface water and flood water of stream from his land is subject to the condition that if there are two ways of doing it, equally efficacious, and neither requiring unreasonably greater expense than the other, one only of which will damage adjoining property, the other must be adopted; so that ditches protecting both would be required in place of a levee injuring one.

6. DRAINS. *Ditches through watershed in district permitted by statute to give additional powers to districts.*

Ditches across a drainage district, through a divide or watershed therein, being a necessary part of a larger scheme to protect the land on both sides ordinarily drained by a creek on either side from periodical overflows from one of the creeks, which waters each year for several months flow over the divide, *held* permitted by Laws 1924, chapter 257, section 1, to give additional powers to drainage districts, and not violative of section 6 providing that the act shall not be construed to permit diversion of water from one watershed or basin to another.

ETHRIDGE, J., dissenting.

*Headnotes 1. Drains, 19 C. J., Section 16; 2. Drains, 19 C. J., Section 4; 3. Drains, 19 C. J., Section 5; 4. Drains, 19 C. J., Section 194 (Anno.); 5. Waters, 40 Cyc., p. 642; 6. Drains, 19 C. J., Section 159.

APPEAL from chancery court of Leflore county.

HON. C. L. LOMAX, Chancellor.

Temporary organization of Bear Creek drainage district was by decree made permanent, over the protest of H. P. Toler and others, and they appeal. Affirmed and remanded.

*Moody & Williams* and *Percy & Percy,* for appellant.

Under the statute, pursuant to which the district was organized, no power is granted to make the improvements designated as Plan A; but, to the contrary, such improvements are expressly prohibited by the statute. The

plan contemplates the construction of the levee, the sluiceway and the three canals.

Aside from the statute, to which your attention shall later be directed, two general questions are presented. The first is whether the district, if the plans had so provided, would have the right to construct and maintain a levee along the line of the divide indicated by the three parallel lines, in order to protect that part of the district lying to the west of the divide from the overflow waters of the Yazoo river, assuming that the mouth of Wasp Lake would not be closed by the sluiceway. This question must be answered in the affirmative if the opinion of this court in *Jones et al. v. George,* 89 So. 231, is followed. The facts in the case cited, are, in substance, identical with the facts of the instant case. This question, be it noted, relates solely to a levee *at the divide*—not the levee at the mouth of Wasp Lake, as that levee presents a different question.

There cannot, of course, be two conflicting rights. If there is a right to obstruct the flow by the levee, then there cannot be a right to accelerate the flow by means of a canal. We mention this to make it clear that the rights of the landowners to the west of the three parallel lines have not only been disregarded but invaded by the plans as proposed to and adopted by the court.

The second question is whether by means of the levee and sluiceway the surface water flowing naturally into Bear creek can be collected and discharged in a body upon adjoining landowners? That this cannot be done clearly appears by the ruling of this court in *Board of Drainage Commissioners v. Board of Drainage Commissioners,* 127 Miss. 64, 95 So. 75.

*The right to construct levee and sluiceway.* One effect of the levee and sluiceway, when closed, will be to protect the district "from the accidental or extraordinary flood waters" of the Yazoo river which, when a stage of one hundred eight feet is reached, will spill over the divide and thence into the Sunflower river. If Bear creek is like Burr bayou, which is referred to in

*Jones* v. *George,* 89 So. 231, and the principle announced in that case is followed, the levee can be constructed, for there would be no riparian rights of the owners of the lands, to the east of and adjoining the Yazoo river to have the overflow waters of that river flow as it was wont to flow, that would be invaded. If, on the contrary, the owners of the land to the east of and adjoining the Yazoo river have the right to have the overflow waters flow as they were wont to flow, then their rights would be invaded and the construction of the levee would be illegal. We may suggest, however, that Bear creek is different from Burr bayou in that the spillway across the divide is not directly out of Bear creek, but out of a tributary thereof, Sky Lake, across the divide, through Little Jackson bayou and Oak bayou, tributaries of Sky Lake.

The above is *one effect,* but not the *sole one,* of constructing the levee and sluiceway. The other *effect,* and the *vital* one so far as this particular case is concerned, is this: During the period the sluice is closed Bear creek will reach, of necessity, a flood stage as the outlet thereof will be closed. This would be the inevitable result, regardless of the rainfall, as Bear creek is a running stream. Therefore, the question arises how shall such surplus or flood waters be legally cared for by means of the levee and sluiceway proposed to be constructed? An answer to this question must be determined by reference to the powers vested in a drainage district by the statute pursuant to which it is created. A drainage district, though an instrumentality of the state and a public or *quasi*-public corporation, "derives its powers from the statute and not the court creating it." 19 C. J. 627; *Northern Drainage District* v. *Bolivar County,* 71 So. 380.

The district here was created pursuant to chapter 195, Laws of 1912, and the amendments thereto. The last expression of the legislative will, in the form of an amendment to this chapter, is chapter 257, Laws of 1924. By reading section 1 of that chapter you may see that

the surplus and overflow waters of Bear creek, during the period the sluiceway is closed, are, by means of the levee and sluiceway, diverted in a manner not authorized, but prohibited by the express terms of that section. Therefore, it is submitted, the construction of the levee and sluiceway—even if it be held that the riparian rights of the owner of lands to the east of and adjoining the Yazoo river could be invaded—is expressly prohibited and not authorized by the statute by virtue of which the district is created. It cannot be, and will not be, denied that the levee and sluiceway is the vital factor of Plan A, on which Plan B is wholly dependent.

*The right to construct ditches and canals.* The three ditches or canals proposed to be constructed are in palpable violation of the section just quoted. Water is taken from a point in Sky Lake, a tributary of Bear creek, and not returned to either Sky Lake, Bear creek or the Yazoo river. This has reference to ditches Number Four and Five. Water, by ditch Number Two, is taken from a point in Bear creek, a tributary of the Yazoo river, and not returned to either. Therefore, if it be assumed that the levee and sluiceway could be lawfully constructed, yet this vital element of the plan is prohibited by the statute, so the whole scheme must fail.

*Prescriptive right.* There is yet, by the express terms of the statute, still another vital objection to the construction of the canals. It may be assumed that, from the time whereof the memory of man runneth not to the contrary, the overflow waters of the Yazoo river have backed up or over the divide and flowed through Little Jackson bayou and Oak bayou, and thence through other watercourses into the Sunflower river; that by reason thereof, a prescriptive right to the continuance of such flow has been acquired. Therefore, having such a right, an enlargement of the watercourses, by means of the canals, is only doing that which has been acquired by prescription. But section 6 expressly says, "That nothing herein contained shall be construed to permit the

enlargement of any prescriptive rights, now or hereafter existing or acquired.''

*Separate basins.* All of the lands, as the chief engineer of the district testified, and as the chancellor found as a fact, lying to the east of the three parallel lines, are in the Yazoo basin or watershed. That to the west of those lines is in the Sunflower basin or watershed. By means of the three canals the water is diverted from the watershed of the former to that of the latter. The construction of the canals whereby this result follows is likewise met by an express prohibition of section 6: ''That nothing herein contained shall be construed to permit the enlargement of any prescriptive rights now or hereafter existing or acquired; *nor permit the diversion of water from one watershed or basin to another watershed or basin.''*

The chancellor seems to have based his opinion, not on the statute heretofore referred to, but on the question of damage or no damage. The objections, we urge, are based on the statute. The cases heretofore referred to were used, not as decisive, but as an aid to the application of the terms of the statute to the facts. It seems, however, that the chancellor was not impressed with the vital significance of the statute as it seems to us. The fault must be ours. Therefore, to avoid a like mistake, we have applied the statute to the facts.

The chancellor seemed to be of the opinion that the right to divert is based on the principle of *damnum absque injuria.* We do not so understand the law. See as to this *Chapman* v. *Copeland,* 55 Miss. 476.

Our position is this: A drainage district, as an instrumentality created by the legislature, can exercise only such powers as are granted it by the act of creation. The work can be done, regardless of consequences, if the powers be granted; otherwise, not. Therefore, it is not a question of consequences, but of statutory power to do the work. The legislature, and not the court, passes on the question of consequences when the question of the power to do or not to do an act is before it. The statute before you grants the power to do an act, provided it is

done in a certain manner. Any manner other than that authorized is, of course, prohibited. Therefore, in conclusion, we submit that the vital question presented by the record is one of statutory power; and, by the terms of the statute, the appellee is expressly prohibited from doing that which it was organized to do. If so, then the organization of the district would be vain and, of course, the decree must be reversed.

*Mortimer & Sykes,* for appellee.

The chancellor below found that the system of drainage proposed is practical and will effect the purpose for which it is intended and that no one will suffer injury or be damaged thereby; but, on the contrary, that all will be benefited. If his action is reversed, it means that another district will be immediately organized by those persons owning land west of the little ridge in the district which Judge Moody *magnanimously* designates as a "divide;" and a large levee constructed for the length of this divide, thereby obstructing all natural channels running from Bear creek to the Sunflower river, with the result that all of this fertile territory east of this ridge will become nothing more or less than a reservoir for the overflow waters of the Yazoo river, and not worth the payment of taxes thereon.

Counsel's whole brief is predicated on the theory that if the district is constructed, water will be diverted from Bear creek where it naturally flows during periods of low water to the Sunflower river. If he is wrong in this assumption, and the record shows that no water will be diverted from the Sunflower river, then his objections are not well founded, and the case should be affirmed. The chancellor has found that there is no diversion of waters and the undisputed testimony warrants and justifies him in this finding. In fact, any finding to the contrary would be manifestly wrong, and not supported by the evidence.

We have quoted figures to show the court that instead of this district proposing to cut the "divide," Nature

has already cut it to take care of the flood waters of the
Yazoo river, and the waters from that territory today
flow to the Sunflower river during such periods through
deep, well-defined and natural channels.

. The chancellor found both as a matter of fact and
law that these, as well as the channels on each side of the
twelve-hundred-foot artificial ditch, were natural chan-
nels. We submit that he was correct in that finding un-
der the following authorities: *Ferris* v. *Wellborn,* 64
Miss. 29, 880-165; *Learned* v. *Hunt,* 63 Miss. 373; *Hughes*
v. *Levee Com.,* 27 So. 744; *Duncan* v. *Cannon,* 81 Miss.
334, 33 So. 81; *Railway Co.* v. *Beard,* 83 Miss. 294, 48 So.
405; *Carley* v. *Levee Com.,* 95 Miss. 617, 49 So. 266; *Bel-
zoni Drainage District* v. *Winn,* 98 Miss. 359, 53 So. 778;
*Quitman County* v. *Carrier Lumber Co.,* 103 Miss. 324,
60 So. 326; *Indian Creek Drainage District* v. *Garrott,*
85 So. 312; *Jones* v. *George,* 89 So. 231; *Palmer* v. *Wod-
dell,* 22 Kan. 352; *McKinley* v. *Freeholders,* 29 N. J. Eq.
171; *Simmons* v. *Winters,* 21 Ore. 35, 21 Pac. 7; *Wolf*
v. *Crothers,* 21 Pa. Co. Ct. 624; *Blohowals* v. *Grochoski,*
119 Wis. 199, 96 N. W. 551; *Beer* v. *Stroud,* 19 Ont. 10;
*San Gabriel* v. *Los Angeles County* (Cal.), 9 A. L. R.
1205.

Since these channels are natural channels, they may
be improved and widened and deepened for drainage
purposes. *Pompey Lake* v. *McKinney Lake,* 99 So. 387.

The *whole* system of drainage devised is to defend and
protect the lands in the district from the common enemy,
"roaming flood waters," which have left the channel of
the Yazoo river. These flood waters not only block all
drainage from the district, but cause it to overflow. A
system of drainage having as its only object keeping the
Yazoo flood waters out of the district would not help
any as the district would overflow from surface water;
and a system of drainage to take care of the surface
water only and not keep out the Yazoo would do no good.
There are two *causes* for the condition now existing—
Yazoo flood waters and surface waters—but there is but
one effect, the *overflow.* To take care of the *one effect* it is

necessary to provide against *both causes.* Plan A and Plan B are, therefore, interdependent and the one is useless without the other. When we, therefore, provide against the "roaming flood waters" of the Yazoo, we *must* provide against the surface waters of the district. If we have a right to do the former, then we have a right to do the latter; otherwise, our remedy would be incomplete and valueless. That we have a right to do the former is settled by this court in *Indian Creek Drainage District* v. *Garrott*, 85 So. 320.

Counsel's second objection to the organization of the district is that the legislature has not authorized the character of improvements proposed to drain this territory, but on the contrary has prohibited it. His whole argument as to this is based on the hypothesis that water which now flows to Bear creek and the Yazoo river is being diverted to the Sunflower. This fact was found against him below and if this court is of the opinion that the chancellor was correct in so doing, then his whole argument is without application to the instant case.

Chapter 257, Laws of 1924, does not deprive drainage districts of any power which they had prior to its passage.

We take issue with counsel on his proposition that there cannot exist at the same time the right to construct a natural channel and the right to improve it. We say the two rights can exist and the interested parties have the right to select whichever plan is most efficient, practicable and economical. If the same result can be attained by channeling at a small expenditure as by levees at a great expenditure, they may choose the former or *vice versa.* See, also, *Holman* v. *Richardson,* 76 So. 136.

With reference to counsel's contention as to "prescriptive rights," we think *Pompey Lake Drainage District* v. *McKinney Lake Drainage District,* 99 So. 387, settles this.

In the instant case, the channels to be improved are natural ones; they do not divert water because the flood waters of the district go through them now; and with the district constructed, no more water will go through, but three-fifths less. 2 Farnham, sec. 487.

We think that the chancellor below was correct and that this case should be affirmed.

Argued orally by *Leroy Percy* and *C. C. Moody,* for appellants, and *J. A. Sykes* and *J. A. Tyson,* for appellee.

SMITH, C. J., delivered the opinion of the court.

This is an appeal from a decree of the court below making permanent a temporary organization of the Bear creek drainage district over the protest of the appellants, who own land in the district. The district embraces something over one hundred thirty-five thousand acres of land in the counties of Leflore, Sunflower, and Humphreys. It is bounded on the east by the Yazoo river, and partly by Roebuck Lake on the northeast. Roebuck Lake connects with the Yazoo river, but whether it is tributary thereto or is an outlet for flood waters thereof does not appear, and whether it is the one or the other is not material.

To the west of the district is the Sunflower river, a large stream which flows in a southerly direction and empties into the Yazoo river not a great distance before it reaches the Mississippi river. The elevation of the land in the district from the Yazoo river west rises until at a point some distance to the west of the center thereof it reaches an elevation of one hundred eight feet above sea level. The surface water on the land east of this elevation, which we will hereafter designate as the divide, flows into the Yazoo river mainly through Bear creek into Wasp Lake, which connects with the river. The surface water on the land west of the divide flows into the Sunflower river largely through Dawson bayou. The Yazoo river overflows annually, and when

the water therein reaches an elevation of ninety-six feet above sea level, it backs up Bear creek, and, when it reaches an elevation of one hundred eight feet above sea level, crosses the divide through natural depressions therein and flows through Dawson bayou into the Sunflower river for periods varying from three to six months. The elevations reached by the flood waters of the Yazoo river vary, sometimes reaching the height of one hundred fifteen feet above sea level. The extent of the inundation from the flood water of the Yazoo river of the land west of the divide depends on the elevation of the water above sea level.

One of the purposes for which the district is sought to be established is to prevent the flood water of the Yazoo river from inundating any of the land within the district, and is to be accomplished by the construction of a levee along the south bank of Roebuck Lake and the west bank of the Yazoo river. The levee will be pierced by a gap at Wasp Lake, in which gates will be placed, which will be closed when the water in the river reaches an elevation of ninety-six feet above sea level, and will be opened when it falls below that level.

After the levee is constructed, and when the gap therein at Wasp Lake is closed, the surface water of the district east of the divide will accumulate in Bear creek and overflow a part of the land on that side of the district, and when Bear creek reaches an elevation of one hundred eight feet it will go over the divide into the Sunflower river. In order to prevent this overflow the distict proposes to dig three ditches across the divide of sufficient depth and width to carry the water from Bear creek, after the gap in the levee at Wasp Lake has been closed, across the divide into Dawson bayou, through which it will flow into the Sunflower river. These ditches will so conduct the water only when the gap in the levee at Wasp Lake is closed, and when that gap is open Bear creek will flow into the Yazoo river. When the gap in the levee at Wasp Lake is closed, no water from the Yazoo river will enter Bear creek or otherwise cross the

divide, and less will then be conducted across the divide by these ditches than now crosses it during the flood periods of the Yazoo river.

One of the objections in the court below to the establishment of the district was that Bear creek is a navigable stream, and consequently the district would be without power to obstruct its outlet into the Yazoo river. The court below heard evidence for and against this contention, and held that Bear creek is not a navigable stream, which holding is not here contested, and will not be inquired into.

The land owned by the appellants lies west of the divide, and the objection to the establishment of the district which they here press is to the digging of the ditches by which the flood water of Bear creek will be conducted across the divide into the Sunflower river when the gap in the levee at Wasp Lake is closed.

One of the provisions of the statute under which this drainage district is sought to be organized is that such a district may be established "if it appear that the establishment thereof be necessary for the promotion of public health and for agricultural purposes," and "be to the advantage of the owners of real property therein, and for the public benefit." Section 2, chapter 269, Laws of 1914 (Hemingway's Code, section 4438). The purpose which it is sought to accomplish by the establishment of the district is to protect the land therein from inundation by the periodical overflows of the Yazoo river, which purpose the chancellor found on evidence so warranting would be accomplished by the levee and ditches which the district proposes to construct and dig. This finding of the chancellor is not seriously, and could not be successfully, contested. It may be that all of the land in the district will not be benefited to the same extent by the establishment of the district, but, if so, that fact is of no consequence, for equality of benefits is not essential to the formation of a drainage district.

The appellants admit that the levee proposed to be constructed will be beneficial to them, and they raise no

objection thereto. Their complaint is that a part of the scheme which the district proposes to put into effect, and which will be necessary in order to protect the land east of the divide from overflow, is to conduct the water which accumulates in Bear creek after its outlet into the Yazoo river has been closed by means of three ditches across the divide into the Sunflower river. Their contention in support of this objection in effect is that not only does the statute not confer upon drainage districts the right to conduct water from one watercourse to another, or from one watershed to another, but that so to do is expressly prohibited by sections 1 and 6, chapter 257, Laws of 1924, and under the common law, which the statute has not displaced, the appellants have the right to construct a levee along the divide sufficiently high to prevent the flood water of the Yazoo river from crossing it and overflowing their lands, which right is inconsistent with and excludes any right in the appellee to conduct such flood water across the divide by means of ditches.

The authority of the legislature to enact laws for the establishment of drainage districts is derived from the police power. *Cox* v. *Wallace,* 100 Miss. 525, 56 So. 461. The purpose for which such districts may be and are established is to promote the public welfare (*Cox* v. *Wallace, supra; Jones* v. *Drainage District,* 102 Miss. 799, 59 So. 921), and the private drainage rights of the landowners who own the land composing the district become, *ex necessitate,* merged in and are supplanted by the rights relative thereto conferred by the statute on the district. If each landowner continues after the establishment of a drainage district to have the right to drain his land as he pleases, the district could not properly function, and each landowner therein would be at the mercy of every other to the same extent that he was before the district was established, one of the things which the statute authorizing the establishment of drainage districts was enacted to prevent. We are not here concerned with the extent to which the legislature may go in establishing drainage districts, for the provisions

of the statute hereinbefore set forth under which the district here in question is to be established is well within the power of the legislature. *Cox* v. *Wallace,* and *Jones* v. *Drainage District, supra.* It follows necessarily from the foregoing views that any rights which the appellants may now have to construct a levee along the divide to protect their land from flood waters of the Yazoo river will become merged in and must yield to the rights relative thereto with which the drainage district will be vested when established.

But the right of the appellants to protect their land from the flood waters of the Yazoo river by constructing a levee along the divide is not absolute. They have the right at common law to fend such water from their land, but if there are two ways of doing so, each equally efficacious and neither requiring unreasonably greater expense than the other, one of which will damage adjoining property and the other will not, the latter method must be adopted by them. *Holman* v. *Richardson,* 115 Miss. 169, 76 So. 136, L. R. A. 1917F, 942. To construct a levee along the divide will protect the land lying west of it, but will damage the land lying east of it, but to construct a levee along the west bank of the Yazoo river and conduct the water which will accumulate in Bear creek when the gap in the levee through which it usually flows into the Yazoo river is closed, by means of ditches crossing the divide into the Sunflower river, will effectually protect the land both east and west of the divide, and will inflict no damage on the land west of the divide. Consequently, to permit such levee and ditches to be contructed and dug not only violates no common-law right of the appellants, but is consistent therewith.

So far we have dealt with the rights which the proposed drainage district will have under chapter 195, Laws of 1912, and the amendments thereof up to but not including chapter 257, Laws of 1924, and have arrived at the conclusion that thereunder the proposed drainage district would have the right to conduct the water which accumulates in Bear creek after its outlet into the Yazoo

river has been closed by means of ditches across the divide into the Sunflower river, so that we come now to the appellants' contention that so to do is prohibited by sections 1 and 6 of chapter 257, Laws of 1924. This statute, it will be observed, is not intended to limit any power which chapter 195, Laws of 1912, and its amendments confer upon drainage districts, but was intended to add other powers thereto, for it expressly provides in section 1 that such districts "are hereby given the power, in addition to those powers now given by said chapter 195, Laws of 1912, and amendments thereof, to construct," etc., and, in section 6, "that this act shall not be construed to repeal, amend or modify any existing laws, but shall be deemed as supplemental to the law as it now exists." This inquiry might well end here, but out of deference to counsel will be pursued further.

The power conferred by section 1 is:

"To construct and maintain by-passes, for conveying surplus and overflow waters by means of ditches, canals, floodways, levees, conduits, or other artificial means by shorter and more direct route from tributaries of natural streams, and their watersheds, to their main watercourse, and from one point in a natural watercourse to another point therein; provided, however, said by-passes, ditches, canals, floodways, levees, or conduits shall empty the water directly into the same natural water course to which it would naturally flow."

The restriction on this power contained in section 6 of the statute is:

"That nothing herein contained shall be construed to permit the enlargement of any prescriptive rights now or hereafter existing or acquired; nor permit the diversion of water from one watershed or basin to another watershed or basin."

The appellants' contention in this connection is that when the outlet of Bear creek into the Yazoo river is closed, the only water that will accumulate in that creek is surface water, and that which flows into it from its tributaries, all of which should naturally flow into the

Yazoo river and not into the Sunflower river. Consequently, to conduct this water from Bear creek across the divide into the Sunflower river would violate the statute. The facts on which this contention is predicated are true, but it does not follow therefrom that the statute will be thereby violated. The Sunflower river is one of the watercourses to which all of the water on both sides of the divide will naturally flow when it reaches an elevation of one hundred eight feet above the sea level, and when it reaches that elevation and flows over the divide it is composed of both the flood water of the Yazoo river and the surface water of the district. Consequently, if the levee is constructed, the effect of the ditches proposed to be dug across the divide will simply be to cause the water to flow from Bear creek into the Sunflower river earlier than it would in a state of nature; that is, before it reaches an elevation of one hundred eight feet. Were it not that the flood water of the Yazoo river inundates the land west of the divide, section 1, chapter 257, Laws of 1924, would prevent the conducting of water from Bear creek across the divide into the Sunflower river, but as such flood water does cross the divide and flow into the Sunflower river in a state of nature, the statute not only does not prohibit, but, on the contrary, authorizes, the digging of ditches by which the flow of such water to the Sunflower river will be accelerated.

The foregoing views are not in conflict with the case of *Pompey Lake Drainage District* v. *McKinney Lake Drainage District,* 136 Miss. 168, 99 So. 387, which was decided before chapter 257, Laws of 1924, was enacted, and in which this court held that a drainage district is without the power to divert water from one watercourse to another into which it would not naturally flow. In that case, McKinney Lake drainage district sought to conduct water ''out of McKinney Lake, a natural watercourse, and discharge it into White Oak bayou through which the waters of McKinney Lake originally did not go except in cases of unusual floods or overflows.'' It

did not appear in that case that the land through which White Oak bayou flows was damaged by the water which occasionally flowed into it from McKinney Lake, and the diversion of water from McKinney Lake into White Oak bayou was for the benefit of the McKinney Lake land only, and was no part of a scheme to protect both the McKinney Lake and White Oak bayou land from periodical overflows of McKinney Lake. In the case at bar, the surplus water from Bear creek periodically flows over the divide into Dawson bayou for a period of from three to six months, and floods a large part of the land drained thereby, and the diversion of water from Bear creek to Dawson bayou, if such it can be called, is a necessary part of a larger scheme, the purpose of which is to protect the land ordinarily drained by both Bear creek and Dawson bayou from periodical overflows of Bear creek caused by similar overflows of the Yazoo river.

*Affirmed and remanded.*

Ethridge, J. (dissenting).

I think the chancellor was in error in his holding on both of the points involved in the case. The first objection raised which the majority opinion declines to notice because it was not argued is that the court had no power to organize the district because Bear creek, and the other streams and lakes connecting it with the Yazoo river, were held by the chancellor not to be a navigable stream, and consequently that the organization of the drainage district was not prohibited by section 81 of the Constitution of Mississippi, which prohibits the legislature from permanently obstructing any of the navigable streams of the state. In stating this proposition, one of the attorneys for the appellants said:

"The first objection relates to the power of the legislature to authorize, for drainage purposes, the obstruction of a navigable waterway. It was, and still is, contended that Bear creek is a navigable waterway, the ob-

struction of which is prohibited by section 81 of the Constitution. The chancellor on the submitted facts found that Bear creek was not a navigable waterway. While his finding as to this fact is contended to be wrong, yet the record is too voluminous and our time is too limited to attempt to establish the contrary. Therefore, on this appeal, that objection, though still urged, shall not be argued by us.''

Of course, ordinarily a point not argued by counsel in their briefs or at bar will not be noticed by the court, and will be considered to have been waived. But where, as in the present case, the constitutional provision stands as an insuperable obstacle in the pathway of the court in organizing a drainage district, it cannot be ignored, because to ignore it is to permit the organization of the drainage district and the permanent obstruction of navigable waters which is plainly prohibited by said section 81 of the Constitution: This section reads as follows:

''The legislature shall never authorize the permanent obstruction of any of the navigable waters of the state, but may provide for the removal of such obstructions as now exist, whenever the public welfare demands. This section shall not prevent the construction, under proper authority, of drawbridges for railroads, or other roads, nor the construction of booms 'and chutes' for logs in such manner as not to prevent the safe passage of vessels, or logs, under regulations to be provided by law.''

The plan here proposed in organizing the district is to put a permanent obstruction at the entrance of these waters in the Yazoo river. Bear creek and the different lakes constituting the waterway obstructed has long been navigated. The record shows indisputably that it was used for navigation purposes generally for many years, and that even the federal government had appropriated money for the purpose of keeping it in navigable condition as late as the year 1907.

In order to understand the constitutional provision, it would be necessary to understand what was considered a navigable stream at the time the Constitution was

adopted. There is no dispute in the record whatever that at the time the Constitution was framed these streams were navigable. There is no dispute whatever in the evidence as to this.

Section 865, Code of 1880, which was in force at the time the Constitution was adopted, provides:

"All rivers, and such of the creeks and watercourses, within this state, as shall have been declared to be navigable streams, by act of the legislature, or by the board of police or board of supervisors of the county in which the same may be, shall be public highways."

It will be seen that any stream that had been theretofore declared to be navigable, either by the legislature or by the former boards of police, or by the then boards of supervisors in the county in which the stream may be, is declared to be a public highway.

Section 866, Code of 1880, provides:

"The board of supervisors shall have power, when the public good may be promoted thereby, to appoint hands, liable to work on public roads, and living within a convenient distance of any navigable stream within their respective counties, to work thereon; and the said board shall divide such stream into convenient districts, and appoint overseers, and assign as many hands thereto as may be properly taken from the public roads; and the laws respecting the working of roads shall apply, in all respects, to the work to be performed on such navigable streams, and to the erection and maintenance of bridges thereon."

It will be seen from this section that it was the duty of the road hands, under the direction of the board of supervisors, to keep the navigable streams clear of obstructions, so that they might be open to the public for the purpose of general use, and all persons had rights equal with others to use the streams for the purpose of navigation.

Section 867, Code of 1880, makes it the duty of overseers to remove all logs and overhanging timbers that may be in or across such streams, and all other obstruc-

tions of the navigation thereof. Section 2872, Code of 1880, makes it a criminal offense to obstruct such navigable streams, showing the purpose of keeping them open and free from obstruction for public navigation. These sections have been brought forward into all of the subsequent Codes, and are still statutes of the state.

It may be that in the present case, or any other that may arise hereafter, all of the parties within the district to be organized desire to close the streams to navigation, but every person who may be in the state or who may come into the state has the right to use these navigable streams for his business purposes, and to permit the organization of an extensive drainage district, and to tax the taxpayers therein, and to issue bonds of such drainage district for such purposes, and to leave the question open for future decision, when the whole scheme would be set aside at the suit of some other person, or of some other officer of the state who would be authorized to act for the state therein, would be to work a manifest and unpardonable injustice.

The proof in this record shows without dispute that these streams are full of water for long periods during the year, and there is no proof to show that there has been any diminution whatever in the water supply therein. In other words, they are just as capable of navigation now as they were in 1890 when they were largely used for that purpose.

The present statute, section 7088, Hemingway's Code, (section 4408, Code of 1906), in defining what are navigable streams, provides:

"All rivers, creeks and bayous in this state, twenty-five miles in length, that have sufficient depth and width of water for thirty consecutive days in the year, for floating a steamboat with carrying capacity of two hundred bales of cotton, are hereby declared to be navigable waters of this state."

This statute, it is true, was enacted in the year 1896, being chapter 64, Laws of 1896, after the Constitution of 1890 went into effect.

The record shows that these streams are at flood tide from three to six months in the year, having about twelve feet of flood waters in depth above their normal waters during that period of time.

It is true that the chancellor found that the streams are not navigable, but he did not find these facts not to exist, and could not so find, because they were not disputed, but some time before the organization of the district the Congress of the United States had passed an act declaring these streams nonnavigable and ceased to appropriate money for such navigation. But this did not have the effect of changing the streams as navigable streams for such navigation as they had always been used for. The proof, without any dispute, shows that these streams have been extensively used for commercial navigation. The use of these streams for navigation had been diminished, not because of the insufficiency of the water or for any other natural reason, but purely because the railroad development in the state had largely changed commerce from the channels of waterways to railroad lines, but in the recent years one of the leading railroads passing through this territory has been on the verge of bankruptcy, and has indeed become so unprofitable that its use has been threatened to be discontinued. Should such railroad line be discontinued, the importance of these streams as navigable streams would be restored to their former value and necessity. The section of the Constitution above set out may not be a wise one, but it seems to me that this court, and every other branch of the state government, is powerless to override it.

Coming to the second question which is dealt with in the majority opinion in this case, it seems to me that the majority opinion is clearly wrong, for the reason that the waters are diverted from the basin in which they are accustomed to flow into another basin where they have never flowed until the flood waters reach a height of one hundred eight feet above sea level. The normal height of water above sea level is below ninety-six feet,

and when the channels proposed to be constructed are constructed, all of the waters in the Bear creek basin, which is a very comprehensive territory, will pass through these canals into Sunflower river basin, where they never have flowed during such periods.

It is true that when the flood raises above one hundred eight feet the waters would then flow into the Sunflower basin, but it was only the flood waters that flowed therein, whereas, in the present scheme, the waters that are designed to flow through the canals are the stream waters, or natural waters, that flow normally in the Bear creek basin and are not either flood waters or vagrant waters. In other words, Bear creek during such period changes its course entirely, and all of its waters, instead of remaining in the Bear creek basin, are discharged through the canals into the Sunflower basin.

It may be true that the levee will shut out more flood waters from the Sunflower basin than the streams will discharge through the canals into that basin, but there certainly will be a much longer period of time when the waters of the Bear creek basin will flow into the Sunflower basin than would be if the district were not created. Whenever the Yazoo river gets above ninety-six feet above sea level, and at all times until it reaches one hundred eight feet above sea level, these natural waters of the Bear creek basin will flow into the Sunflower basin where they have never flowed before.

While the present decision is distinguishable from the decision in *Pompey Lake Drainage District* v. *McKinney Lake Drainage District,* 136 Miss. 168, 99 So. 387, still, some of the principles announced in the two decisions are, in my opinion, inconsistent. In the present case the opinion asserts that inasmuch as the waters of the Bear creek basin would ultimately pass into the Sunflower basin during flood stages, that it is permissible to hasten their flow and cut through the divide. This seems to me to be contrary to the cases heretofore decided.

In discussing the effect of artificial channels which had become in effect a stream by acquiescence for the length

of time necessary to constitute prescription and the rights thereunder with reference to such stream, in the opinion in the case of *Pompey Lake Drainage District* v. *McKinney Lake Drainage District,* 136 Miss. at page 177, 99 So. at page 399, we said:

"But we think that before it can be treated as a natural stream or watercourse within the meaning of law, so that it may be widened and deepened for drainage purposes, it must be a channel which takes care of the water naturally and normally flowing through the watercourse. In other words, when the course of a stream is entirely changed by an artificial channel so that all of the water passing through the original channel passes through the artificial channel and continued under such conditions as would confer rights by prescription, then such artificial channel would be treated as though it were originally in that water channel. But where only a part of the water of the natural watercourse is taken through an artificial channel, or diverted by an artificial channel, the rights acquired by prescription are limited by the character and condition of things existing through the prescriptive period. It might be that an artificial channel would carry only a small part of the waters of a natural watercourse during the prescriptive time and the conditions in existence might not be objectionable, but, on the contrary, might be beneficial. But after the prescriptive period had passed the channel and water cannot be materially increased to the detriment of other persons having rights in the stream. It has never been the law, so far as we are advised, that water of a watercourse could be changed and diverted so as to entirely change the watercourse to the damage of other property owners without compensation for such damages, if it could be done at all."

In the case before us the court now holds that this situation may be changed, provided such change would not carry more water into the Sunflower basin than was carried into it during the flood period when the Yazoo river reached one hundred eight feet above

sea level and higher. In other words, as I understand, it has been the law heretofore that you could not change natural waters or stream waters from their basin at all regardless of comparative damage. The proposed district would certainly carry these waters into the territory of the Sunflower basin for a much longer period of time than they would be flooded by the waters above one hundred eight feet. Of course, under the decision, if this is done, and if it results in largely damaging the property owners in the Sunflower basin, there can be no remedy, because the law does not provide for compensation, and, as I understand, this must be done under section 17 of the Constitution of 1890, whenever waters are diverted and property is thereby damaged. The law does not take cognizance of benefit in assessing these damages, nor does it compare and set off one damage against another. If the Bear creek basin is entitled to empty its streams and surplus waters into the Sunflower basin, then any other territory would have the same right under the same conditions, and the result may be to utterly ruin the property owners on the lower reaches of Sunflower river. The property owners outside of the district are not given a hearing under the statute, and there is no scheme provided for paying their damages if they are in fact damaged by such diversion. I think, if such should prove to be the fact, these property owners could come into the chancery court and have the district abated and the canals filled up at ruinous expense.

I think my position is sustained by the following authorities: *Quitman County* v. *Carrier Lumber Co.,* 103 Miss. 324, 60 So. 326; *Thompson* v. *Railroad Co.,* 104 Miss. 651, 61 So. 596; *Leflore County* v. *Cannon,* 81 Miss. 334, 33 So. 81; *Liles* v. *Cawthorn,* 78 Miss. 559, 28 So. 834; *Ham* v. *Levee Commissioners,* 83 Miss. 534, 35 So. 943; *I. C. Railroad Co.* v. *Miller,* 68 Miss. 760, 10 So. 61; *A. & M. R. R. Co.* v. *Beard,* 93 Miss. 294, 48 So. 405; *Corley* v. *Levee Commissioners,* 95 Miss. 617, 49 So. 266; *Hughes* v. *Levee Commissioners* (Miss.), 27 So. 744; *Duncan* v. *Levee Commissioners,* 74 Miss. 125, 20 So. 838; *Richard-*

*son* v. *Levee Commissioners,* 77 Miss. 518, 26 So. 963; *Vicksburg* v. *Herman,* 72 Miss. 211, 16 So. 434; *Learned* v. *Hunt,* 63 Miss. 373; *Belzoni Drainage District* v. *Winn,* 98 Miss. 359, 53 So. 778; *Railway* v. *Bloom,* 71 Miss. 247, 15 So. 72; *King* v. *Vicksburg Ry. & L. Co.,* 88 Miss. 456, 42 So. 204, 6 L. R. A. (N. S.) 1036, 117 Am. St. Rep. 749.