Mississippi Power & Light Co. *v.* Blake, et al.

No. 41082          March 16, 1959          109 So. 2d 657

*Dent, Ward, Martin & Terry,* Vicksburg; *Bethel Ferg-uson, Green, Green & Cheney, Byrd, Wise & Smith,* Jackson, for appellant.

*Prewitt & Bullard*, Vicksburg, for appellees.

Lee, J.

This is an appeal by Mississippi Power and Light Company from a judgment of the Circuit Court of Warren County which granted writs of prohibition permanently restraining the Company from proceeding with three eminent domain suits against D. C. Blake and others in the county court.

The Mississippi Power & Light Company was chartered under the laws of the State of Florida with its domicile at Tallahassee in that state. It duly qualified in 1927, and, since that date has been doing business in this State as a public utility for the generation, manufacture, transmission, and distribution of electricity to the public for compensation. On March 29, 1956, it possessed franchises and facilities in forty-six counties and one hundred and thirty-two municipalities, among which were Hinds, Warren, Issaquena and Sharkey Counties, and the Cities of Jackson, Vicksburg and Rolling Fork. Its principal generating plants are located in the City

of Jackson and near the Cities of Natchez and Cleveland.

Following the approval on March 29, 1956, of Chapter 372, Laws of 1956, the Power Company, within six months after the effective date of the Act, by filing its application with the Public Service Commission for a certificate of public convenience and necessity, complied therewith and became an established utility with a franchise of public convenience and necessity as provided by Section 5(b) thereof, Section 7716-05 (b), Code of 1942, Recompiled.

Thereafter, on February 19, 1957, the Power Company filed its petition with the Public Service Commission for a certificate of public convenience and necessity to construct a 115 KV transmission line from Vicksburg to Rolling Fork in Warren, Issaquena and Sharkey Counties, to construct a 115 KV sub-station north of Vicksburg, to install suitable terminal facilities at Vicksburg and Rolling Fork, together with related facilities, and for the approval of a contract to furnish electric energy to the Mississippi Valley Portland Cement Company in Warren County. The estimated cost of the improvement was $1,292,000. There was a prayer for the issuance of process, giving reasonable notice of the hearing and the purpose thereof to all interested persons, as, in the judgment of the Commission, might be necessary. A notice to all interested persons of the purport of the petition and the place and date of the hearing, namely, in the office of the Commission in the Woolfolk State Office Building at Jackson, Mississippi, at 10 o'clock A. M. on April 2, 1957, was published by the Secretary of the Commission in the Jackson Daily News on March 7, 1957.

The Yazoo Valley Electric Power Association entered its appearance in the cause and answered that the Mississippi Valley Portland Cement Company was about to construct its plant about eleven miles north of the City of Vicksburg, which location would be within the

"grandfather area" of the Association; but that the Association's supply of electricity was of insufficient adequacy to enable it to serve the plant properly. Consequently it had determined to forego its legal right to serve the plant, and therefore made no objection to the proposal.

On the hearing before the Commission J. D. Phillips, assistant planning engineer of the applicant, testified substantially as follows: The proposed 115 KV line will run from the present Vicksburg sub-station to the present 115 KV sub-station at Rolling Fork. He identified a map which showed the two sub-stations to be built and the line from Vicksburg, through the city and to the cement plant and Rolling Fork, with the cost therefor estimated at $1,292,000. For several years the line had been projected in a forecast. It is needed, together with the existing facilities, in connection with the Rex Brown Steam Electric Station to provide transmission capacities northward, for the use of facilities between Jackson and Vicksburg, thence from Vicksburg to Rolling Fork, and existing facilities from Rolling Fork to Greenville in order to provide a fourth circuit. At present there are only three circuits from Rex Brown, whereas this improvement will provide a fourth circuit to north central Mississippi, and is necessary to handle the total capacity at Rex Brown, and for the system's stability and overall requirements. It is needed for the north Vicksburg area, to give two-way service to Rolling Fork, which is on a mere radio tap line, and to take care of the growth in the area regardless of whether a cement plant is built. More circuits assure greater stability, because if all lines lead from the same generating plant and an emergency arises, all lines could possibly trip. A thorough study of the route had been made. Its estimated length is fifty-one miles and it would be only about a mile shorter if the cement plant was not to be served. The nature of the area, the avoidance of clearing, and

the accessibility for maintenance were the bases for the selection of the proposed route.

V. K. Smith, a registered, professional engineer with the Power Company testified that, in 1929, the load on the sub-station in Vicksburg for Warren and Claiborne Counties was less than 3,000 kilowatts. By 1953, it had grown to 14,600, and by 1958 it would reach a total load in excess of 30,000 kilowatts. A sub-station north of Vicksburg is the most economical means of preventing a long haul. The necessary voltage cannot be maintained in hauling large blocks of power over low voltage lines. This has to be done over a transmission rather than a distribution line. Besides a 115 KV line must be available for the cement plant.

Kent B. Diehl, Sr., chief engineer and general manager of Mississippi Valley Portland Cement Company, testified in detail as to the needs and requirements of the plant, showing that electricity is vital because every unit is operated by that kind of power; that the motors have 5,000 horsepower connected load, with the largest operated on a voltage of 4,160 and the others on 440 and 360; that the existing facilities in that area could not take care of their requirements; that a dependable source of power is necessary, and that 340 days a year is the minimum operation; and that a power failure would be disastrous to their operations.

At the conclusion of the hearing, the Public Service Commission, on April 18, 1957, adopted an order awarding the relief prayed for, granted the certificate of public convenience and necessity, and approved the contract to furnish electric energy to the Mississippi Valley Portland Cement Company.

Thereafter the Power Company filed three separate eminent domain proceedings, in the County Court of Warren County, against D. C. Blake and others, against Paul U. Nones and others, and D. C. Blake, Trustee, and others, for the condemnation of lands and a right-

of-way, as therein described, in order to effect the completion of the extension and improvement.

The defendants in those suits filed in the circuit court petitions for writs of prohibition under Section 2782, Code of 1942, Recompiled. It was charged that the facts, as alleged in the eminent domain suis, failed to show that the Power Company had any right of eminent domain; that it in fact did not have such right; that their property would be taken for a private and not a public use; and that there was no public necessity for such taking.

The answers of the Power Company thereto denied in detail all of the allegations of the petitions for the writs.

The causes were consolidated and heard together.

The Power Company offered in evidence a certified copy of the proceedings before the Public Service Commission.

V. K. Smith testified that, during the past ten years, there has been a ten percent annual increase in the use of power in the Vicksburg area. A plat showing the Company's operations was introduced. A detailed description of the line showed that there would be a fourth circuit into Vicksburg and a second circuit into Rolling Fork. At present there are three circuits into north and central Mississippi; but, when the Rex Brown Steam Electric Station at Jackson is completed in 1959, a fourth circuit will be required. By extending the circuit from Jackson to Vicksburg, and thence to Rolling Fork, the fourth circuit will thereby be completed. It will also supply the needs of sub-stations en route, the one north of Vicksburg, the one at the cement plant, and any others that may be needed. A thorough study by the Company showed the necessity for this, and that the most economical way would be to build from Vicksburg to Rolling Fork. At present Rolling Fork is on a tap line off of the line running from Rex Brown to Greenville. An accident to the present line could throw that area en-

tirely out of service. But, with the new line, there will be two-way service. The consumers in the Vicksburg area will also have a fourth source of supply, giving a firmer service. He gave a detailed breakdown of the cost. It was determined in 1956 to build this line, and the cement plant of course did not enter into the picture. It was not until January 31, 1957, that the needs of the cement plant came into play. The line from Vicksburg to North Vicksburg has already been completed, and the extended line will stabilize the service because an accident could start a chain reaction that, at present, could trip the other two circuits. The building of transmission lines merely for the cement plant would not be economical. But there has been a great increase in the use of power in and around Vicksburg. The load growth in the North Vicksburg area cannot be served economically from the sub-station to the south. There are no distribution circuits in the vicinity of the cement plant capable of even starting, operating or running the plant. At present two-way power cannot be delivered into Rolling Fork. This proposed line is intended to give an integrated service. Power may go both from Rex Brown and from Delta Steam. The line is an absolute necessity. Basically the route would be practically the same if there were no cement plant. It is necessary to bend the line slightly, about a mile, to meet that need at a cost of approximately $15,000. The terrain and acessibility to roads and the railroad determined the route. The Yazoo Valley Electric Association's power is not adequate to serve the cement plant.

A. H. Barber, a civil engineer for the Company, testified that when he made the first survey, the cement plant had not come into the picture. In selecting a feasible route, construction, maintenance and operation are the basic questions. Public roads and railroads are taken into consideration. The present route, because the land is reasonably open, and being accessible to a highway

and the railroad, would be taken even if the cement plant was not in existence. Farther west, there are lower swamp lands, with lots of timber and lakes, making it very inaccessible. The witness made an investigation to the east. There it is hilly, the terrain is rough and hard to enter with heavy equipment. There are numerous landslides and the timber is heavy. It would be more costly to build and maintain a line in that area. It is not practical to miss the land of appellees. It is necessary to cross those lands as the most feasible route.

The exhibits showed that the Board of Directors of the Power Company approved the eminent domain proceedings.

For the defense, Lize R. Parker, General Manager of Yazoo Valley Electric Power Association, testified that the Association's right-of-way parallels Highway 3. He admitted that its present facilities are totally inadequate to service the cement plant and that this service cannot be met without a transmission line. D. C. Blake testified that he negotiated with the Power Company to run its line east of the highway. He frankly stated that there is a large swamp with timber and sloughs to the west and that the area is subject to overflow. In his opinion there was no public need for additional power or an additional transmission line. He said that it is obvious that the cement company "has an edge in power there" but that he has no need because he has all he wants. Newell Simrall, Sr. testified that, along the boundary line of Warren and Issaquena Counties, there is farm and cutover land, but the ground is about ten feet lower. He knew of no power needs between Vicksburg and Rolling Fork except for the cement plant. He admitted that the alternate route is overflowed at times and is not accessible by automobile. Marvin Allison testified that he was familiar with the route of the Power Company and that, along this route, much of the land is open, crossing old fields; and that west of

the railroad the area is woody and contains lots of water. James E. Gorman admitted that the area is very low, and was of the opinion that the cement plant only needed more power.

Following the admission of evidence, the trial judge thereafter delivered a written opinion in which he expressed doubt as to the public necessity for the extension and was of the opinion that he should resolve the doubt in favor of the landlords. He thought that the taking in this instance where another route as short was available "would be oppressive and selfish." He thought that the route east of the highway and railroad tracks could be used. Consequently he ordered the temporary writs of prohibition to be made permanent.

The appellant, under the provisions of Section 2780, Code of 1942, Recompiled, is empowered to exercise the right of eminent domain. However, by the enactment of Chapter 372, Laws of 1956, this statute was super-imposed upon Section 2780, supra, in the exercise of that right. Consequently, as a condition precedent to the exercise thereof, the Power Company was required to obtain from the Public Service Commission a certificate of public convenience and necessity. See Section 7716-05, Code of 1942, Recompiled, where it is provided as follows: "No person shall construct, acquire, extend or operate equipment for manufacture, mixing, generating, transmitting or distributing natural or manufactured gas, or mixed gas, or electricity, or water, for any intrastate sale, to or for the public for compensation, or for the operation of a public utility operating a business and equipment or facilities as contemplated by sub-section D (3) of Section 1 (Section 7716-01), of this act, without first having obtained from the commission a certificate that the present or future public convenience and necessity require or will require the operation of such equipment or facility." In view of the above language, this Court in Mississippi Power & Light

Company v. Town of Coldwater, 106 So. 2d. 375 (Miss.), said that the trial court erred in holding that it was not necessary for the cop-operative there involved, before making a construction or extension of its facilities at an expense of more than $35,000, to obtain from the Public Service Commission a certificate of public convenience and necessity. In other words, the statute meant what it said.

It has been repeatedly held that the public necessity for taking private property is a legislative question. Ham v. Levee Commissioners, 83 Miss. 534, 35 So. 943; City of Greenwood v. Gwin, 153 Miss. 517, 121 So. 160; Miss. State Highway Commission v. Cockrell, 205 Miss. 826, 39 So. 2d 494; Culley v. Pearl River Industrial Commission, 234 Miss. 788, 108 So. 2d 390.

Since the Legislature had the right and power to determine the public necessity, it of course also had the power to delegate that function to the Public Service Commission. The action of the Commission, in granting a certificate, cannot be overturned if it is supported by substantial evidence, and is not arbitrary or capricious, or beyond its power to make, and does not violate some constitutional right. California Company v. State Oil & Gas Board, 200 Miss. 824, 27 So. 2d 542. In that case, the opinion, in holding that there could be no jury trial on an appeal from the Board's order, pointed out the inconsistency of permitting the opinion of experts, charged with the responsibility of a great public policy of the State, to be nullified or swept away by the opinion of nonexperts in that field.

It is true that, under Section 2782, Code of 1942, Recompiled, the appellees could test "(2) whether there is a public necessity for the taking of the particular property or a part thereof which it is proposed to condemn." Erwin v. Miss. State Highway Commission, 213 Miss. 885, 58 So. 2d 52, so holds. But the opinion, in pointing out the limited area of the writ of prohibition and in

commenting upon the case of City of Natchez v. Henderson, as applicable thereto, said:

"The limited area within which the court can review an exercise of the eminent domain power, even under the statutory writ of prohibition, is illustrated in City of Natchez v. Henderson, 1949, 207 Miss. 14, 41 So. (2d) 41, 42. The City of Natchez had instituted proceedings in eminent domain against one acre of land owned by Henderson, for a proposed site for a water tower and supplementary equipment for the City. Henderson petitioned under Code Sec. 2782 for a writ of prohibition, which the circuit court granted. On appeal it was stated that the evidence showed that Henderson's land was suitable and economical and upon the highest ground available. The trial court was reversed and the writ of prohibition vacated. The Court said:

" 'The testimony was overwhelming that a public necessity now exists for the installation of the tower. Much of the testimony for appellee was directed to the availability of other sites.

" 'A decision by the City that a particular site is best adapted to its proposed public use is legislative and is not reviewable by the courts. It is not to be restricted in its choice between two or more available sites. Ham v. Levee Commissioners, 83 Miss. 534, 35 So. 943; City of Greenwood v. Gwin, 153 Miss. 517, 121 So. 160; 29 C. J. S., Eminent Domain, Secs. 90, 91; 18 Am. Jur., Eminent Domain, Sec. 108. The learned circuit judge found as a fact that a public necessity existed for an additional water tower. The issue whether the contemplated use is public is of course a judicial one. Miss. Constitution 1890, Sec. 17. His granting of the writ was grounded upon the availability of other suitable sites. As has already been stated, this is not determinative nor controlling, and therefore not a subject of judicial review. The judge was moved in some degree by a consideration for

the appellee whose disappointment over the expropriation of his land was repeatedly made manifest.' "

See also Ham v. Board of Levee Commissioners, supra, where it is said: "The building of the new levee being within the power of the board of levee commissioners, and the taking of the private property being judicially determined to be for a public use, the courts will not place judicial restraint upon the manner in which the board, in the exercise of its discretion, uses the power providentially delegated to it by the state. It is for the courts to determine that the proposed taking is for a public use, but, this being so decided, it is for the commissioners to decide upon the necessity of such taking. * * * Courts will interfere and review the exercise of the discretion of those to whom the power of eminent domain has been delegated by the legislative enactment only in exceptional cases—as when property is appropriated for private purposes under the guise of public use, or if the condemnation is sought for private gain, or from willful or malicious purposes, or to injure or destroy the rights of other parties, or that they acted without warrant of law and oppressively." See also State Highway Commission v. Fuller, 224 Miss. 712, 80 So. 2d 814; Ohio Oil Company v. Fowler, 100 So. 2d 128 (Miss.).

■■ ■ The proof in this case, both before the Commission and the court, showed conclusively that the demands for electricity were constantly increasing; that the existing facilities were becoming inadequate; that the present extension was contemplated before any question of the cement plant arose; that the construction of the Rex Brown unit will greatly augment the appellant's power potential; that Rolling Fork is on a tap line and at the end of the line, so to speak; that, by the construction of the proposed line the Rolling Fork area will have a two-way service; and that at present there are three circuits north from Rex Brown, and this proposal will

enable it to provide a fourth circuit, which will be of great benefit to consumers. In other words, the consummation of this proposal is a great public necessity. Incidental thereto, the large cement plant will be able to obtain the necessary power. But such incidental benefit does not invalidate the taking. 2 Nichols, Eminent Domain (3rd Ed. 1950), Section 7.222; Culley v. Pearl River Industrial Commission, supra.

As against the obvious need for this improvement was the evidence of several nonexpert witnesses, who, because they did not need any more power for their local purposes, expressed the opinion that the extension was not necessary. In addition, what they said in opposition to the proposed route was of little value.

On the other hand, the proof for the appellants showed that the route which it had selected is the most feasible and economical to construct and maintain because of the terrain and acessibility to roads and the railroad. The appellees' suggested route to the west is unquestionably on lower ground and more inaccessible. Their suggested route to the east, which the appellant duly considered, was shown to be hilly, of rough terrain, with landslides, timber, and hard to enter with heavy equipment.

Manifestly there is a great public need for the proposed improvement, and the use of the property will be in the public interest. Since the evidence clearly showed that the proposed route is the most economical and feasible on account of the terrain and its accessibility to roads and the railroad, it is obvious that the condemnation of the property does not constitute oppression.

It is clear that the learned trial judge erred in granting the writs of prohibition. It follows that the cause must be, and it is, reversed, and the writs of prohibition are vacated.

Reversed, writs of prohibition vacated, and judgment here for the appellant.

*Roberds, P. J.,* and *Kyle, Arrington* and *Gillespie, JJ.,* concur.