MISSISSIPPI POWER COMPANY, et al., APPELLANTS *v.* SOUTH MISSISSIPPI ELECTRIC POWER ASSOCIATION, et al., APPELLEES

No. 43693 February 14, 1966 183 So. 2d 163

756

*Wise, Smith & Carter, Watkins & Eager,* Jackson; *Eaton, Cottrell, Galloway & Lang,* Gulfport, for appellants.

758

760

*Welch, Gibbes & Graves,* Laurel; *Hedgepeth, Price & Hedgepeth,* Jackson, for appellee.

PATTERSON, J.

This is an appeal by Mississippi Power Company and Mississippi Power & Light Company from a final decree of the Chancery Court of Hinds County affirming an order of the Public Service Commission which granted a certificate of public convenience and necessity to South Mississippi Electric Power Association. The order authorized construction and operation of a steam electric generating plant in Jones County and an electric transmission system necessary to its operation in southeast Mississippi.* The purpose of such facility and transmission system is to provide a bulk supply of electricity to four of the corporate members of South Mississippi Electric Power Association. We affirm.

---

*An electric generating facility of 65-megawatt nameplate rating to be located on a 55-acre site in Jones County, Mississippi, and approximately 392.6 miles of transmission lines extending out from the facility to 26 delivery points of four electric power associations in 17 counties of southeast Mississippi. It is estimated these facilities will cost in excess of $15,000,000.

South Mississippi Electric Power Association, hereinafter referred to as petitioner, is a Mississippi corporation organized and operated under the Electric Power Association Act, Chapter 184, Mississippi Laws of 1936, Mississippi Code Annotated section 5463 et seq (1956). It has authority to engage in all types of utility operations, including the generation and transmission of electric energy. It is composed of nine corporate members, each of which is an electric power association organized and operated under the Electric Power Association Act *supra* and each of which is engaged in the transmission, distribution and sale of electricity to the public. The corporate members of the petitioner are: Singing River Electric Power Association, Dixie Electric Power Association, Southern Pine Electric Power Association, Pearl River Valley Electric Power Association, Coast Electric Power Association, Magnolia Electric Power Association, Southwest Mississippi Electric Power Association, Capital Electric Power Association, and East Mississippi Electric Power Association. Four of these associations, Singing River, Dixie, Southern Pine, and Pearl River Valley, were made respondents to this petition by order of the commission. Though designated as respondents, their position in essence is the same as that of the petitioner as each confesses the petition.

Mississippi Power Company, one of the two protestants, is a foreign corporation authorized to do business in this state. It is a private utility engaged in the business of generating, transmitting, and distributing electricity in the southeastern part of the state.

Mississippi Power & Light Company, the other protestant, was a foreign corporation organized and operated under the laws of Florida, but it is now chartered in Mississippi. It is also a private corporate utility engaged in the business of generating, transmitting and distributing electricity. Its service area is roughly the western part of the state.

These two utilities, Mississippi Power & Light Company and Mississippi Power Company, are hereinafter referred to as the protestants except when specific reference is made to one or the other.

At the present time the electric power associations, individually, purchase their electric power supply from either one or the other of the protestants. These sales by the protestants to the individual associations are authorized by "grandfather certificates" granted to the protestants by the Public Service Commission under the authority of Mississippi Code Annotated section 7716-05 (b) (1956). These grandfather certificates were granted to the protestants as they sold bulk or wholesale supplies of electric energy to these delivery points at the time of the act. The certificate to Mississippi Power & Light Company (Commission Docket U-44) authorizes it to serve a specified delivery point of Southern Pine. The certificate to Mississippi Power Company (Commission Docket U-99) authorizes it to sell electric energy to the power associations at specified delivery points. However, this certificate is subject to the following restrictive language in the commission's order: "The commission is not hereby adjudicating the legal effect of the certificate herein granted as to service to the aforesaid associations, nor is the commission determining in this proceeding that the certificate herein granted binds said associations to continue receiving such service." At the time this suit was instituted in 1960 these sales to the associations comprised .32% of the total sales of Mississippi Power & Light Company and 4.14% of the total sales of Mississippi Power Company.

The petitioner's application for authority to construct a generating plant and transmission system was filed March 31, 1960, before the commission. The order awarding the certificate of public convenience and necessity was entered on March 7, 1963, upon the completion of a hearing which comprised 78 days. The voluminous 82-

volume record in this case contains 478 exhibits and is over 12,000 pages in length. The various motions, pleas, and appeals, including one interlocutory appeal to this Court, are so numerous and lengthy that a discussion of them, which would not reach the merits of the suit, would serve no useful purpose.

Subsequent to the perfection of this appeal, petitioner, on July 20, 1965, filed a petition with the Public Service Commission to amend the certificate theretofore granted to it. Petitioner is now seeking, by this amended petition, to enlarge the facility specified in the certificate. The protestants thereupon filed a plea in bar in this Court alleging in substance that this was an admission on the part of the petitioner that the 65-megawatt generating facility, the subject of this suit, is inadequate, would in fact never be constructed, and therefore, by such admission the cause is rendered moot.

The protestants contend, in addition to the plea in bar, that the order of the commission is not supported by substantial and competent evidence, that the order of the commission violates the "existing facility" rule in that it authorizes an unwarranted duplication of service presently being rendered by protestants. They contend that the order of the commission impairs previously existing certificate rights of the protestants and they contend that under either the "existing facility" rule or the "existing certificate right" they were not accorded the opportunity to correct whatever inadequacy of service there existed as is contemplated by Mississippi Code Annotated section 7716-05(f) (1956), and they were thus deprived of valuable rights without due process of law; and finally, they contend that the commission's order should be reversed as it was predicated upon the operation of facilities in violation of law.

■■■ ■ We are of the opinion that the issue raised by the plea in bar is not well taken as more than five years had elapsed from the time of filing the original

application for the generating plant and the July 20, 1965 application seeking to enlarge it. The electric industry is fluid; demands for service are constantly fluctuating. These demands are closely related to economic or business trends, the prosperity or lack of it on the part of the consuming public, and many other factors; the daily, weekly, monthly and yearly electrical requirements, though they can be reasonably estimated, are constantly changing. We conclude, as did the Supreme Court of Kentucky, in *Kentucky Utilities Co. v. Public Service Commission*, 252 S. W. 2d 885 (1952) that: ''The Public Service Commission necessarily must base its decision and actions on the economic conditions existing at the time a case is before it, and it is not in the public interest that a case be prolonged indefinitely by allowing a reconsideration whenever there is a fluctuation in price levels.'' The issue raised by the plea in bar was not before the commission at the time of the hearing. Without deciding that the same is properly before us, we hold that the conditions existing in 1965 were not necessarily the conditions existing in 1960, the year in which the forecasts were made as to the electrical needs, and for this reason the plea in bar should be overruled and this appeal restricted to the economic conditions existing at the time the case was before the commission. The issues raised by the amended application are issues to be determined by the commission when properly presented to it.

 The protestants next urge that there is no substantial evidence to support the order of the commission. The ''substantial evidence'' rule is well established in our jurisprudence both by statute and case law. Mississippi Code Annotated section 7716-26(d) (1956) in reference to orders of the Public Service Commission states in part:

. . . The order shall not be vacated or set aside either in whole or in part, except for errors of law,

unless the court finds that the order of the commission is not supported by substantial evidence, is contrary to the manifest weight of the evidence, is in excess of the statutory authority or jurisdiction of the commission, or violates constitutional rights.

We find the following statement of the rule in the case of *East Mississippi Electric Power Ass'n v. Mississippi Power Co.*, 251 Miss. 310, 314, 169 So. 2d 473, 474 (1964):

> The action of the Commission in granting a certificate cannot be overturned if it is supported by substantial evidence, and is not arbitrary or capricious, or beyond its power to make, and does not violate some constitutional right.

See also *Mississippi Power Co. v. East Mississippi Electric Power Ass'n*, 249 Miss. 869, 164 So. 2d 479 (1964) and *Mississippi Power & Light Co. v. Blake*, 236 Miss. 207, 109 So. 2d 657 (1959) and numerous other Mississippi cases to the same effect. ██ █ After a careful reading of this record we are of the opinion there was substantial evidence based upon competent testimony to support the findings of the commission and that its order was not arbitrary or capricious. We conclude, therefore, that this assignment of error is not well taken.

██ █ The protestants next rely on the "existing facility" rule, sometimes in this state called the Tri-State Transit rule. This rule as stated in *Tri-State Transit Co. of Louisiana, Inc. v. Dixie Greyhound Lines, Inc.* 197 Miss. 37, 48, 19 So. 2d 441, 444 (1944) is as follows:

> . . . That a certificate should not be granted where there is existing adequate service over the route applied for, and, if inadequate, unless the existing carrier has been given an opportunity to furnish such additional service as may be required.

This rule has been applied to the issuance of certificates to public electric utilities under Mississippi Laws ch. 372, § 5 (1956) in *Capital Electric Power Ass'n v. Mississippi Power & Light Co.*, 240 Miss. 139, 125 So. 2d 739

(1961), though in fact the "existing facility" statute (Miss. Code Ann. § 7642) is a part of the Motor Carrier Act. In *Keith v. Bay Springs Tel. Co.*, 251 Miss. 106, 114, 168 So. 2d 728, 730, 732 (1964), in applying the rule to radio telephones we held:

> However, the existing facility rule does not apply unless the services and facilities to be rendered by the new certificate are duplicating and result in waste. Section 5(c) of the Public Utility Act reflects an intent to "prevent unnecessary and uneconomic duplication of such facilities as between two" utilities. See also § 5(f). The rule is a limitation upon the commission's power to issue certificates, but it is relevant for the purpose principally of avoiding wasteful duplication of the existing utility service. . . In short, the existing facility rule, developed under the Motor Carrier Regulatory Act, has been applied to an electric utility under the 1956 act. But it should not be used arbitrarily or inflexibly. The Commission is given the power to determine "that the present or future public convenience and the necessity require or will require the operation of such equipment or facility." . . . This is essentially the determination of a matter of policy, namely, which utility in the opinion of the agency will best serve the public convenience, necessity and welfare.

The Court in Keith *supra* quoted with approval the consideration given such problem in *Utah Light & Traction Co. v. Public Service Commission*, 101 Utah 99, 118 P. 2d 683, 690 (1941), wherein it stated:

> Of course the public interest may well be subserved by preventing waste. * * * But the waste must be such as would injure the public or interfere with its interests, growth and development. It must not be a prevention of waste carried to the extreme where it prevents or interferes with progress in equipment or methods or ways of serving the public. And the de-

termination as to whether waste would result, or whether the waste which did result, would be so against the public welfare and interest that it should be prevented, are questions for the commission to determine.

The commission in its detailed and excellent order* found that there was no uneconomic or wasteful duplication though it did find, in a few instances, the transmission lines of petitioner's proposed system would parallel those of the protestants already in place. Their finding in this and other regards is as follows:

12. For a number of years there has been a constant need for additional generation and transmission facilities in this state and this need will continue to grow. The need for more generating capacity is greater than the capacity of the facilities which petitioner proposes to construct and operate. This is true despite the splendid interconnections which protestants have with other sources and systems within their own respective groups (Mississippi Power Company is a member of the Southern Company group and Mississippi Power & Light Company is a member of the Middle (South) Utilities, Inc. group) and also with systems outside these groups. There is sufficient evidence to sustain this finding. It is enough to mention that: Mississippi Power Company has found it necessary to begin building immediately for operation in 1965 and 1966 approximately 200,000 to 240,000 KW of generating capacity and a substantial quantity of transmission facilities, not only to handle this particular output but to strengthen its transmission system otherwise; leaving aside the benefits of interconnections, both protestants have already exceeded in loads their generating capabilities with the largest

*The Public Service Commission's order deals with every facet of this case in an able and lucid manner, not an easy task in view of the scientific language of the electrical engineers and of the industry. This order would be incorporated in full in this opinion, but we refrain from doing so due to its necessary length.

unit in the system down (in other words, without interconnections their generating capabilities will not sustain their load requirements with firm power); Exhibit 23 shows that from 1956 to 1960 Mississippi Power Company's sales to ultimate consumers and electric power associations increased by 49.1%. Exhibit 24 shows that for the same period Mississippi Power & Light Company's increased by 39.2%. Exhibit 211 shows that in a ten year period from 1950 through 1960 the four respondents had an increase in power sales of 260.20% and the nine members of South Mississippi Electric Power Association had an increase of 262.43%.

13. The construction and operation of petitioner's proposed system would not result in uneconomic duplication of facilities of other utilities. This record does not show that any substantial duplication of transmission facilities would be produced by the construction of the proposed system by the petitioner. In virtually all instances protestants' transmission lines were already in place before the delivery points were established thereon to serve the respondents. Only in a few instances would the transmission lines of petitioner's proposed system physically parallel those of protestants. (Rec. pp 12,377-12,378).

We have heretofore stated that the order of the commission was based upon substantial evidence. The rule announced in Tri-State Transit *supra,* and here repeated in part "that a certificate should not be granted where there is existing adequate service over the route applied for. . ." is urged upon us by the protestants as being applicable here. We cannot agree with this contention. A comparison of Tri-State with the case at bar produces a strained analogy at best. It dealt with the right of two common carriers (bus companies) to offer passenger service to the public over the same route or highway. The commission found that a certificate of public con-

venience and necessity was not warranted by the facts before it. This order was reversed by the chancery court on appeal and the chancery court's order was reversed by this Court and the commission's order reinstated. Though the "existing facility" rule was announced in the opinion, the case actually turned upon the basis of there being substantial evidence to support the finding of the commission. Here the issues are not directly related to the public. Neither are they related to the same service area, but rather the issues presented here relate to the contested right of two corporate utilities to serve with wholesale electricity a facility (delivery point) or link between or adjacent to two service areas. However, assuming but not deciding, that there is a close analogy between the two cases, we still are of the opinion that this assignment of error is not well taken. We rely upon the commission's specific finding that there was no uneconomic duplication here and in so doing we follow precisely the Court's ruling in Tri-State as it too relied specifically upon the finding of the commission as the basis for its decision. Compare Keith *supra* wherein we stated: "The fatal flaw in Monroe's argument is this: There was substantial evidence to support the finding of the Commission. . ." (251 Miss. at 114, 168 So. 2d at 730). We conclude this assignment of error is not well taken.

 ██ The protestants further contend that the order of the commission was erroneous in that it impaired valuable rights existing in them by virtue of the "grandfather" certificates they hold which authorize them to sell electric energy to the power associations. They cite *Capital Electric Power Ass'n v. Mississippi Power & Light Co.*, 240 Miss. 139, 150, 125 So. 2d 739, 743 (1961) wherein we held:

> Having served the electrical requirements in the Elton area for more than 17 years, Capital Electric, under paragraph (b) of Section 5, Laws of 1956, Sec-

tion 7716-05, Code of 1942, acquired the right to a certificate of convenience and necessity therein, being in truth and in fact a franchise from the State. Such right is indeed a valuable one.

The certificates of the protestants authorize the sale of electricity to specified delivery points. The certificate of Mississippi Power Company is restricted by the following language of the commission:

> The commission is not hereby adjudicating the legal effect of the certificate herein granted as to service to the aforesaid associations, nor is the commission determining in this proceeding that the certificate herein granted binds said associations to continue receiving such service.

There can be no doubt the protestants will be affected to some degree by the certificate granted to the petitioner as .32% of Mississippi Power & Light Company's 1960 business stemmed from its sales to the associations and 4.14% of the business of Mississippi Power Company from its sales for the same period. The generating facilities of the petitioner will supplant these sales to the associations. It is well to keep in mind that petitioner is a federation of nine power associations, respondents being four of them, so in essence petitioner is a corporation through which the associations will generate their own power as they have the statutory right to do under the Electric Power Association Act, Chapter 184, Mississippi Laws of 1936, Mississippi Code Annotated section 5463 et seq (1956). The issue thus restricts itself to this narrow question: Do the protestants by their certificated rights to sell, which we have held to be valuable, acquire by the certificates the absolute right to continue these sales to a utility which desires to generate its own electricity and which has a statutory right so to do? An affirmative answer to this question would indeed render the petitioners captive customers of the protestants who are in reality their competitors. We

find no comfort in the authorities cited by counsel nor were we able to find direct authorities by our own research to answer this perplexing question. We turn again to the commission's finding and order as to the results we should reach. It found:

> For a number of years there has been a constant need for additional generation and transmission facilities in this state and this need will continue to grow. The need for more generating capacity is greater than the capacity of the facilities which the petitioner proposes to construct and operate. This is true despite the splendid interconnections which protestants have with other sources and systems within their own respective groups. . .

In candor we should state that the commission has not found the services of either of the protestants to be inadequate, but rather found, as noted, there was a need for additional generating capacity broad enough to encompass the 65-megawatt generating facility authorized. Under these circumstances (a deficit of generating capacity) we are of the opinion that the commission properly held the needs of the public above the grandfather certificates of the protestants as we are of the opinion that it was not the legislative intent that a grandfather certificate under Section 7716-05(b) was to supersede the Electric Power Association Act, Chapter 184, Mississippi Laws of 1936, which authorized the associations to generate their own energy. The so-called "franchise" doctrine, referred to in the Elton case for example, does not apply to the issuance of a certificate of convenience and necessity for a wholesale electric transmission line. Such a certificate is a privilege, regulated and controlled by the state within due process limitations. The idea that a franchise or charter granted by the state may be immutable and unamendable by the state was finally and effectively eliminated by the 1890 Constitution. Mississippi Constitution 1890 §§ 178, 179, 180, 181, 182; cf.

*Southern Bell Tel. & Tel. Co. v. Meridian*, 241 Miss. 678, 131 So. 2d 666 (1961). In reaching this conclusion we note that the loss of sales by the protestants, though not insignificant, is not total as the energy may be diverted to their own needs for which there is ample demand.

██ ██ Protestants contend further, however, that under the provisions of Section 7716-05(f) they are entitled to the particulars of any inadequacy of service, either under the "existing facility" or "valuable franchise" rule, and that they must be afforded a reasonable time by the commission to correct such inadequacy. This statute provides:

(f) The commission may, after a hearing had upon due notice, make such findings as may be supported by proof as to whether any utility holding a certificate under the provisions of this act is rendering reasonably adequate service in any *area* covered by such utility's certificate, and in the event the commission finds that such utility is not rendering reasonably adequate service the commission may enter an order specifying in what particulars such utility has failed to render reasonably adequate service and order that such failure be corrected within a reasonable time, such time to be fixed in such order. If the utility so ordered to correct such failure fails to comply with such order of the commission and the commission finds that cancellation of its certificate would be in the best interest of the consuming public served by the holder of the certificate, its certificate for the *area* affected, may be revoked and cancelled by the commission. (Emphasis ours.)

Protestants urge that since the petitioner did not directly follow the statutory remedy for inadequacy, that, in effect, the petition under Section 7716-05(c) (certificate of public convenience and necessity) is a collateral attack upon their valuable franchise rights and they are deprived of due process thereby. We are of the

opinion this contention is not well taken as the statute refers to a specific service area and not to a facility (delivery point) as here, and there is no finding that the protestants are not rendering "reasonably adequate service", and by the plain terms of the statute the remedial provisions thereof are not applicable until there be such finding. We conclude that this assignment of error is not well taken and that the protestants' constitutional rights were not violated by the order of the commission in this proceeding.

Finally, protestants contend that the commission's order should be reversed because public convenience and necessity cannot be predicated upon the operation of facilities in violation of law. They urge that public convenience and necessity fails when it is shown without dispute that the terms of the federal statute (Title 7, section 904, USCA), and the terms of the loan agreement itself would be violated in that the loan would be used to duplicate existing "central station service."

In the case of *Alabama Electric Cooperative v. Alabama Power Co.,* 176 So. 2d 483, 487 (Ala. 1964), the court made the following statement:

'It has been consistently held that the legality of a loan approved by the Administrator of the REA is not subject to a collateral attack in a hearing before a public service commission or the duly constituted state authority which, in Alabama, is the Director of Finance. (Citing cases). In each of these decisions, the question of the violation of the central station service feature of the federal act was raised but, in each instance, the decision was in favor of the cooperatives. In view of the authorities cited supra, we feel that we cannot agree with the contention of appellees that this is a question on which we should pass.

■ ■ Without deciding whether protestants have standing to raise this question we hold, as did the Ala-

bama court, but this question is not a proper one to be raised in this proceeding.

The electric power associations are products of legislative enactment. They are privileged to use the powers granted in such enactment and are of course subject to its limitations. As such they have legal status comparable to other utilities without this Court's opinion as to the underlying philosophy of the act.

We are of the opinion the cause should be affirmed.

Affirmed.

All Justices concur.